# EXHIBIT "1"

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                                    Chapter 7

1516 BEDFORD AVENUE HOUSING                                Case No. 18-45044-nhl
DEVELOPMENT FUND CORPORATION,

                            Debtor.
-----------------------------------------------------------------x

### STIPULATION PERMITTING SALE OF PROPERTY SUBJECT TO AFFORDABILITY RESTRICTIONS AND SETTLING VARIOUS DISPUTES AND CLAIMS

**WHEREAS**, on or about September 4, 2018 ("Petition Date"), 1516 Bedford Housing

Development Fund Corporation ("Debtor") filed a voluntary petition for relief under Chapter 7 of

Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for

the Eastern District of New York ("Bankruptcy Court"), and Lori Lapin Jones was appointed as

Chapter 7 Trustee of the Debtor's Estate ("Trustee"); and

**WHEREAS**, as of the Petition Date, the Debtor was the owner of record of real property

and the building and improvements thereon known as and located at 1516 Bedford Avenue,

Brooklyn, New York, Block 1252, Lot 80 ("Property"); and

**WHEREAS**, the Debtor was formed in 1989 as a Housing Development Fund Corporation

("HDFC") under Article XI of the New York State ("NYS") Private Housing Finance Law

("PHFL") for the purpose of developing affordable housing and as a cooperative corporation under

the NYS Business Corporation Law ("BCL"); and

**WHEREAS**, by deed dated May 8, 1989, the City of New York ("City") granted title to

the Property to the Debtor, wherein the Debtor agreed to operate the Property solely as a housing

1

project for persons or families of low income as defined in section 576 of Article XI of the PHFL; and

**WHEREAS**, the Debtor has represented that it has four (4) shareholders with an interest in the Debtor: (i) Mildred Williams, (ii) Jermaine Anthony, (iii) Elhassan Hussein and (iv) Edward Gray (collectively, "Shareholders"); and

**WHEREAS**, the New York City Water Board ("Water Board") filed a proof of secured claim in the amount of $478,126.5 for water and sewer charges, which is claim no. 1 on the claims register ("Water Board Claim"); and

**WHEREAS**, the City's Office of Administrative Trials and Hearings ("OATH") filed a proof of claim against the Debtor's estate in the amount of $8,305.37, of which $6,505.37 is asserted as a secured claim, and $1,800 is asserted as an unsecured claim, for, *inter alia*, Environmental Control Board ("ECB") and Department of Health ("DOH") violations, which is claim no. 2 on the claims register ("OATH Claim"); and

**WHEREAS**, the City's Department of Finance ("DOF") filed a proof of secured claim against the Debtor's estate in the amount of $2,993,565.91 for pre-petition real estate taxes and charges, with interest through May 31, 2020, which is claim no. 3 on the claims register ("DOF Claim"); and

**WHEREAS**, DOF filed an administrative secured proof of claim against the Debtor's estate in the amount of $65,596.22 for post-petition real estate taxes and charges, which is claim no. 4 on the claims register ("DOF Administrative Claim"); and

**WHEREAS**, the City asserts that real property taxes and charges against the Property owed to the DOF, including NYC Department of Housing Preservation and Development ("HPD") emergency repair charges transferred to DOF for inclusion on the real property tax account, and

2

inclusive of the amounts in the DOF Claim and DOF Administrative Claim, total $3,114,544.65 with interest through July 27, 2020 ("RPT Lien"), and water and sewer charges against the Property owed to the Water Board total $590,363.17 as of July 27, 2020 ("Water Lien"); and

WHEREAS, the City asserts that the RPT Lien and Water Lien are first priority liens against the Property under the NYC Administrative Code ("Admin. Code"); and

WHEREAS, prior to the Petition Date, HPD commenced an action under Article 7A of the NYS Real Property Actions and Proceedings Law on December 29, 2011 in the Civil Court of the City of New York, County of Kings, Housing Part B ("Civil Court"), Index No. 3063/11 ("7A Proceeding"), and by order entered on February 2, 2012, the Civil Court appointed an administrator to, *inter alia*, operate the Property and remedy certain conditions ("7A Administrator"); and

WHEREAS, due to delinquent real property taxes, the Property was included in *In Rem Tax Foreclosure Action No. 53, Borough of Brooklyn* (Sup. Ct. Kings Co. Index No. 8700/2015) ("Foreclosure Action"), and a foreclosure judgment was entered on December 14, 2017 ("Foreclosure Judgment") pursuant to the *in rem* tax lien foreclosure laws of § 11-401 *et seq.* of the Admin. Code; and

WHEREAS, the City asserts that the period within which to redeem the Property under the Foreclosure Judgment and the Admin. Code expired prior to the Petition Date; and

WHEREAS, the City asserts that the Property was to be transferred pursuant to the Foreclosure Judgment as part of the City's third-party transfer program ("TPT") under 11-412.1 of the Admin. Code and the Rules and Regulations of the City of New York to a third-party transferee operating under a regulatory agreement with HPD and rehabilitated and maintained as affordable housing; and

**WHEREAS,** the Petition Date occurred before a deed under the Foreclosure Judgment was executed; and

**WHEREAS,** the City filed a motion for relief from the automatic stay on December 27, 2018 ("Stay Relief Motion") to permit it to execute a deed pursuant to the Foreclosure Judgment and transfer title to the Property in TPT; and

**WHEREAS**, the Trustee and Debtor filed objections to the Stay Relief Motion arguing, among other reasons and respectively, improper service in the Foreclosure Action, various infirmities in the Foreclosure Action and 7A Proceeding and administration, and oversite of the HDFC, and the right to sell the Property for an amount in excess of the RPT Lien and Water Lien under section 363 of the Bankruptcy Code; and

**WHEREAS,** prior to the Petition Date, the Debtor had entered into a contract of sale to sell the Property with Gavriel Sakoff, as nominee for an entity to be formed, for $4.3 million, not subject to affordability restrictions under State and Local Law, including the PHFL; and

**WHEREAS**, the Trustee filed a motion to sell the property ("Sale Motion") dated January 2, 2019; and

**WHEREAS,** the City filed an objection to the Sale Motion, arguing among other things that the Property could not be sold for market value or surplus proceeds distributed to shareholders under the PHFL, and the Debtor filed a partial objection to the Sale Motion; and

**WHEREAS,** the parties filed additional briefs and replies with respect to the Stay Relief Motion and Sale Motion and issues identified by the Court; and

**WHEREAS**, the parties have worked diligently, cooperatively and in good faith to resolve their issues, and have reached an agreement regarding the sale of the Property, and certain other related matters, as set forth herein; and

4

**WHEREAS**, in view of the costs and uncertainty associated with continued motion practice and litigation and other proceedings in the Bankruptcy Court, the parties hereto have agreed to settle their differences and disputes, upon the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and obligations set forth herein, and other good and valuable consideration, and subject to Bankruptcy Court approval, the parties hereby stipulate and agree as follows:

1.      The Trustee will file a motion seeking approval of this Stipulation by the Bankruptcy Court and authority to sell the Property to 1516 Bedford Avenue LLC ("Purchaser"), as nominee of Gavriel Sakoff for $790,000 ("Purchase Price"), subject to the terms of an appropriate sale order (on terms acceptable to the Trustee) entered by the Bankruptcy Court ("Sale Order"). Such Sale Order shall incorporate the terms of this Stipulation by reference, and to the extent of any conflict between the terms of the Sale Order and this Stipulation, the Stipulation shall control.

2.      The Purchaser and the Shareholders will enter into the Shareholder Agreements annexed hereto as Exhibit "A" ("Shareholder Agreements") with respect to certain payments to be made to the Shareholders by the Purchaser totaling $410,000. The Trustee is not a party to the Shareholder Agreements and shall have no obligation or liability with respect to the Shareholder Agreements.

3.      The City and the Purchaser will enter into the regulatory agreement annexed hereto as Exhibit "B" ("Regulatory Agreement") with respect to the operation of the Property as affordable housing pursuant to the terms set forth therein. The Trustee and the Debtor are not parties to the Regulatory Agreement and shall have no obligation or liability with respect to the Regulatory Agreement.

4.      The City and Purchaser will also enter into the housing repair agreement annexed hereto as Exhibit "C" ("HRA"), as set forth in paragraph 6.E of the Regulatory Agreement, pursuant to which the Purchaser will make repairs to the Property, estimated to cost $1,326,000, on the terms and dates set forth in the HRA. The Trustee and the Debtor are not parties to the HRA and shall have no obligation or liability with respect to the HRA.

5.      The Purchaser agrees to relocate non-shareholder tenants with valid leases during the repair work to the extent required for repairs to occupied units, and will enter into temporary relocation agreements with any such tenants in the form annexed hereto as Exhibit "D" ("TRA"). The Trustee and the Debtor are not parties to the TRA and shall have no obligation or liability with respect to the TRA.

6.      Within ten days of clearance of the Purchase Price following closing on the sale of the Property to the Purchaser, the Trustee shall pay the City $400,000 ("City Payment") in full and final satisfaction of the RPT Lien and the Water Lien (including the DOF Claim, DOF Administrative Claim and Water Board Claim), and any additional taxes and charges and water charges which may accrue through the date of closing of the sale, provided such sale closes on or before November 30, 2020 ("City Lien Payment"). The City Lien Payment shall be allocated to DOF and the Water Board. The Trustee shall make the City Lien Payment pursuant to written instructions from the undersigned counsel for the City promptly after the sale closes. Such payment shall be deemed to be in full and final satisfaction of the Debtor's obligation on account of the RPT Lien and the Water Lien, but such payment shall not be deemed to satisfy any other liens or claims of the City of New York, such as OATH violations, ECB violations, Department of Health violations and Department of Sanitation violations (collectively, "OATH Violations"), which as against the Debtor total approximately $8,377.11 as of July 23, 2020 (inclusive of interest on the

OATH Claim), and Department of Buildings violations, such as boiler violations (collectively, "DOB Violations"), totaling approximately $4,500 in principal as of July 23, 2020.

7.      Within ten days of clearance of the Purchase Price following closing on the sale of the Property to the Purchaser, the Trustee shall also pay: (a) New York City Transfer Tax, which is estimated to be approximately $21,000; (b) the 7A Administrator's fees, which are estimated to be up to $7,500; (c) up to $15,000 for payment of OATH Violations (including the OATH Claim) and DOB Violations, but no more than necessary to satisfy all of such violations, provided that any additional valid and allowable OATH Violations and DOB Violations, if any, will be paid from the Debtor's estate up to $5,000 and in no event shall Purchaser have any obligation to pay any amount beyond the Purchase Price to satisfy any such violations; (d) $72,000 to the Debtor's real estate broker, Jaitegh Singh, in full and final satisfaction of any commissions earned in connection with the sale of the Property; and (e) $68,000 to counsel to the Debtor and the Shareholders, Angelyn D. Johnson, Esq.

8.      The balance of the Purchase Price, after payment of the sums set forth in paragraphs 6 and 7 herein, shall be reserved for payment of: (a) the Trustee's commission and expenses (subject to separate Order of the Bankruptcy Court), which are estimated to be approximately $43,000; (b) the Trustee's retained professionals' fees and expenses (subject to separate Order of the Bankruptcy Court), which are estimated to be approximately $130,000; and (c) distributions in the order of priority under the Bankruptcy Code, which may include distributions to the Shareholders.

9.      Neither the Trustee nor the Debtor's estate shall be responsible for any claims relating to the Property that arose after the Petition Date, other than as set forth herein, and any and all such claims shall be the responsibility of the 7A Administrator. Upon closing of the sale of

the Property to the Purchaser, the appointment of the 7A Administrator shall be deemed to be and hereby is terminated in the same manner as though the Property had been foreclosed in accordance with provisions of 11-412.1(c) of the Admin. Code, and upon such termination shall have the duty to account as set forth in 11-412.1(c) of the Admin. Code. More specifically, upon the closing of sale of the property to Purchaser, the 7A Administrator shall have no rights to manage, operate or otherwise deal with any aspect of the property, except to account for his prior management and operation of the Property by filing a final account with the Civil Court and HPD, which shall be provided to all parties hereto on request. The 7A administrator shall turn over all documents and records related to the operation of the property, including but not limited to all lease agreements, and any outstanding repair bills, utility bills, warranties, appliance receipts, and any other document reasonably requested by Purchaser. Quarterly tax bills for the last 3 years and water and sewer account history will be provided to the purchaser by the City to the Purchaser upon request. The 7A Administrator's monthly reports filed with HPD and the Civil Court, to the extent not otherwise available, will be provide by the City or 7A Administrator upon request.

10.     In consideration of the City accepting the City Payment in satisfaction of the RPT Lien and Water Lien, and subject to payment to the Shareholders of any amounts set forth in the Shareholder Agreements, the Debtor, its estate, and any party claiming an interest therein, including the Shareholders, shall be deemed to have waived any claim against the City with respect to the Property or the Debtor except for rights, claims and obligations under this Stipulation.

11.     This Stipulation will be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, executors, and administrators.

12.     This Stipulation may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute one and the same instrument. An

8

electronically transmitted copy or a facsimile copy of any signature shall be as binding as an original signature.

13.     This Stipulation may not be amended or modified other than in writing executed by all the parties hereto.

14.     If the Bankruptcy Court declines to enter an order approving this Stipulation, then this Stipulation shall be deemed null and void.

15.     This Stipulation is a statement of a compromise and settlement of disputed claims and is the product of arm's-length negotiations. The parties to this Stipulation understand and agree that nothing contained herein shall constitute or be construed as an admission or adjudication, express or implied, of any liability whatsoever with respect to any claims that are the subject matter of this Stipulation, or any issue of fact, law, or liability of any type or nature with respect to any matter whether or not referred to herein, and none of the parties hereto has made such an admission. If the Stipulation is not approved by the Bankruptcy Court, it shall not be used or relied upon for any purpose other than the enforcement of rights under this paragraph. The parties shall not contest that this Stipulation shall be deemed to fall within the protection afforded compromises and offers to compromise by the Federal Rule of Evidence 408 and any similar state law, statute, rule, regulation, or other provision.

16.     This Stipulation shall be construed and governed under the laws of the State of New York.

17.     This Stipulation has been fully negotiated by the parties hereto. Each party acknowledges and agrees that this Stipulation has been drafted jointly, and the rule that ambiguities in an agreement or contract may be construed against the drafter shall not apply in the construction or interpretation of this Stipulation.

9

18.     The Trustee's authority to bind the Debtor's estate to the settlement is subject to approval by the Bankruptcy Court.

19.     This Stipulation is subject to all necessary approvals of the City, including the Comptroller of the City of New York, and will not be submitted to be approved by the Bankruptcy Court until undersigned counsel for the City gives written notice that such approval has been obtained.

20.     The Bankruptcy Court shall retain exclusive jurisdiction over the subject matter of this Stipulation of Settlement.

Dated: Wantagh, New York
      October 1, 2020

**LaMonica Herbst & Maniscalco LLP**
Attorneys for Lori Lapin Jones, Chapter 7 Trustee for the Estate of 1516 Bedford Housing Development Fund Corporation

By:    *s/ Gary F. Herbst*
**Gary F. Herbst, Esq.**
3305 Jerusalem Avenue
Wantagh, New York 11793
(516) 826-6500

Dated: Brooklyn, New York.
      October 1, 2020

**Angelyn D. Johnson, Esq.**
Attorney for 1516 Bedford Housing Development Fund Corporation, Mildred Williams, Edward Gray, Elhassan Hussein and Jermaine Anthony

By:    *s/ Angelyn D. Johnson*
**Angelyn D. Johnson, Esq.**
26 Court Street, Suite 2810
Brooklyn, New York 11242
(718) 875-2145

Dated: Roseland, New Jersey
      October 1, 2020

**Soriano Henkel Biehl & Matthew, P.C**.
Attorneys for Purchaser 1516 Bedford Avenue LLC

By:     <u>*s/ Frederick C. Biehl*</u>
**Frederick C. Biehl, Esq.**
75 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 364-0111


Dated: New York, New York
      October 1, 2020

**James A. Johnson**
**Corporation Counsel of the City of New York**
Attorney for the City of New York

By:     <u>*s/ Hugh H. Shull*</u>
**Hugh H. Shull, Esq.**
Assistant Corporation Counsel
100 Church Street
Room 5-233
New York, New York 10007
(212) 356-2138

**<u>Solely as to Paragraph 9 herein:</u>**
Dated: Brooklyn, New York
      October 6, 2020

**Nancooar Rajcooar, 7A Administrator for 1516**
**Bedford Housing Development Fund Corporation**

<u>*s/ Nancooar Rajcooar*</u>
**Nancooar Rajcooar**
673 Miller Avenue
Brooklyn, New York 11207-6031

# EXHIBIT A

Contract of sale cooperative apartment, 7-2001
Prepared by the Committee on Condominium and Cooperative of the Real Property Section of the New York State Bar Association

### CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## <u>Contract of Sale - Cooperative Apartment</u>

This Contract is made as of ~~August~~ , 2020 ' between the "Seller" and the "Purchaser" identified below.

### 1 Certain Definitions and Information

1.1 The "Parties" are:

**1.1.1 "Seller":** Mildred Williams
*Prior names used by Seller:*
*Address: 1516 Bedford Avenue, Apt 4C, Broolyn, NY*

*S.S. No.:*

**1.1.2 "Purchaser":** ~~1516 Bedford Ave~~ LLC

*Address: 70 Lyman Place, Staten Island, NY 10304*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax):*
1.2.1 "Seller's Attorney"
Angelyn Johnson,Esq
26 Court Street, Suite 2810
Brooklyn, New York 11201
(718) 875-2145 Fax:(718) 875-9318
Email: ajohnson@adj-law.com
1.3 The "Escrowee" is *the Seller* Attorney.

1.2.2 "Purchaser's Attorney"
Frederick C. Biehl III, Esq.
75 Eisenhower Parkway
Roseland, NJ 07068
(973-364-0111 Fax: (973) 364-1073
fbiehl@shsbmlaw.com

1.4 The Managing Agent is *(name. address and telephone, fax):N/A*
1.5 The real estate "Broker(s)" (see ¶ 12) is/are: none1.6 The name of the cooperative housing corporation ("Corporation") is: 1516 Bedford Avenue HDFC
1.7 The "Unit" number is: 4C
1.8 The Unit is located in "Premises" known as: 1516 Bedford Avenue, Brooklyn, NY
1.9 The "Shares" are the 250 shares of the Corporation allocated to the Unit.
1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on
1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and
1.12 Specifically excluded from this sale is all personal property not included in ¶ 1.11 and
1.13 The sale [*does*] [~~*does not*~~] include Seller's interest in [*Storage*]/ [*Servant's Room*]/ [*Parking Space*] ("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Lease.
1.15 The date scheduled for Closing is Court Approved Date ("Scheduled Closing Date") at    (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: $106,250.00 or more
1.16.1 The "Contract Deposit" is: $65,000.00
1.16.2 The "Balance" of the Purchase Price due at Closing is: $41,250.00 (See ¶ 2.2.2)
1.17 The monthly "Maintenance" charge is $N/A    (See ¶ 4)
1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is $0 , payable as follows:

1.19 [*Seller*] [*Purchaser*] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.
1.20 Financing Options (*Delete two of the following* ¶¶ *1.20.1, 1.20.2 or 1.20.3*)
1.20.1 ~~Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~
1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment Letter.
1.20.3 ~~Purchaser shall not apply for financing in connection with this sale.~~
1.21 ~~If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $    for a term of    years or such lesser amount or shorter term as applied for or acceptable to Purchaser; and the "Loan Commitment Date" for ¶ 18 is    calendar days after the Delivery Date.~~
1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.
1.23 All "Proposed Occupants" of the Unit are:N/A
1.23.1 persons and relationship to Purchaser: N/A
1.23.2 pets:
1.24 The Contract Deposit shall be held in [a non-] [an] IOLA escrow account. If the account is a non- IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at Depository:
Address: TD Bank 211 Montague Street, Brooklyn, New York 11201 (See ¶ 27)
1.25 This Contract is [not] continued on attached rider(s).

### 2 Agreement to Sell and Purchase; Purchase Price; Escrow

2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale,

for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract by Purchaser's good check to the order of Escrowee; and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

**3 Personalty**

3.1 Subject to any rights of the Corporation or any holder of a mort-gage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.

3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

**4 Representations and Covenants**

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17and l.l8;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;

4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase.

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

**5 Corporate Documents**

~~Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).~~

**6 Required Approval and References**

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct, Purchaser shall be in default and ¶ 13.1 shall govern.

## 7 Condition of Unit and Personalty; Possession

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

## 8 Risk of Loss

8.1 The provisions of General Obligations Law § 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL § 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

## 9 Closing Location

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

## 10 Closing

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

## 11 Closing Fees, Taxes and Apportionments

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax"),

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and anyother periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank,

certified or attorney's escrow check. This ¶11.6 shall survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate agreement The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

**13 Defaults, Remedies and Indemnities**

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

**14 Entire Agreement; Modification**

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement. 14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

**15 Removal of Liens and Judgments**

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, on business date no less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

**16 Seller's Inability**

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

**17 Notices and Contract Delivery**

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand. Overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶

17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

**18 Financing Provisions**

18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ l.20.1or l.20.2 applies.

18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.

18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

18.2.1 apply only to an Institutional Lender for a loan on the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information, and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one Institutional Lender.

18.3 If ¶ 1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment

Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent bv then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶18.3.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and except as set forth in ¶ 12. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and

inspection expenses and other sums reimbursable pursuant to ¶ 16.

18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:

18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or

18.3.7.2 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.

## 19 Singular/Plural and Joint/Several

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

## 20 No Survival

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

## 21 Inspections

Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

## 22 Governing Law and Venue

This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

## 23 No Assignment by Purchaser; Death of Purchaser

23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in ¶ 12.

## 24 Cooperation of Parties

24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain, execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

## 25 FIRPTA

The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non- Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

## 26 Additional Requirements

26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending *in rem* action, tax certificate/lien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party way cancel this Contract (pursuant to ¶ 16.3) by Notice.

## 27 Escrow Terms

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute. Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys elected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees other paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract

## 28 Margin Headings

The margin heading do not constitute part of the text of this Contract.

## 29 Miscellaneous

This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind

and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

## 30 Lead Paint

If applicable, the complete and fully executed Disclosure of Information on Lead Based Paint and or Lead-Based Paint Hazards is attached hereto and made a part hereof.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

**In Witness Whereof**, the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:     SELLER:     PURCHASER:

_____

_____     ESCROWEE

_____

Mildred Williams

_____

1516 Bedford Ave LLC

_____     _____

_____     _____

_____     _____

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

## RIDER TO CONTRACT OF SALE

SELLER:        Mildred Williams

PURCHASER: 1516 Bedford Ave LLC

PREMISES:      1516 Bedford Avenue, Unit 4C, Brooklyn, NY 11216

**31. In the event of any inconsistency between Bankruptcy Settlement Stipulation under Case No: 18-45044-nhl, provisions of this rider, and those contained in the printed contract of sale to which it is attached, the provisions of this rider shall supercede such inconsistent provisions of the printed contract.**

32. This Contract shall not bind the parties until they each have signed it, and a fully executed copy has been delivered to the Purchaser's attorney.

33. The Parties agree that this Contract may be executed in PDF, facsimile or original signature counterparts, each of which shall be deemed an original, and all which, taken together, shall constitute but one and the same instrument which may be sufficiently evidenced by one counterpart. The Parties further agree that PDF and/or facsimile signatures and copies of this Contract shall be considered legal and binding for purposes of this Contract of Sale.

34. Notice to either party's attorney may be made by electronic delivery by Email, if to the Seller's attorney, to ajohnson@adj-law.com and if to the Purchaser's attorney, to fbiehl@shsbmlaw.com.

35. Supplementing paragraph 1, Purchaser is purchasing the Unit in its present "as is" condition, and that Seller shall have no responsibility to make any improvements, repairs or decorations to the Unit or its equipment, appliances and fixtures prior to closing except as otherwise set forth herein. Seller does not warrant nor guarantee the continued performance of any of the equipment, appliances and fixtures for any period after the Closing.

36. Seller shall not be responsible for or obligated to repair holes.

37. Intentionally omitted

38. Supplementing paragraphs 2 and 13.4, purchaser and any maker of the uncollected instrument for payment of the contract deposit, or any uncollected instrument for the balance of the purchase piece due to seller at closing, shall be jointly and severally liable for the unpaid amount thereof. Purchaser agrees to

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

indemnify seller for all costs of collection thereof including, without limitation, reasonable attorney fees and disbursements, court costs and litigation expenses. The provisions of this paragraph shall survive the closing.

39. Supplementing paragraph 14, purchaser acknowledges having entered into this contract without relying on any claims, promises, statements, estimates, representations, warranties, conditions, broker's documents or other inducements are deemed by the parties to be merged in this Contract.

40. Any increase in maintenance, change in flip tax calculations and/or the imposition of any special assessment following the full execution of this Contract shall not be deemed a misrepresentation or breach by Seller, and shall not relieve Purchaser's obligations hereunder.

41. The acceptance of the shares and assumption of the lease by the purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part on the seller to be performed pursuant to the provisions of this agreement, except those expressly provided to survive the closing.

42. In the event purchaser obtains a title report with respect to the unit or the premises, purchaser shall promptly forward to seller's attorney a copy of such title report and each continuation or supplement thereto, and shall, in writing, specifically identify each objection and exception as to which purchaser requests action by seller and specify the action requested. The delivery of title report shall constitute notice of objection.

43. Supplementing paragraph 21 : Purchaser agrees to indemnify, defend and hold Seller harmless against any losses, damage, claims, costs or expenses for injuries to persons or property, including without limitation , the property of Seller, arising out of the acts or actions of Purchaser, its agents, contractors, decorators, representatives or invitees, Seller shall have no obligation to repair same and may convey same to Purchaser subject to such damage, Purchaser's agreement to indemnify Seller shall survive closing or the earlier termination of this Contract.

44. Supplementing paragraph 4: Without limiting seller's representation as to the amount set forth in paragraph 1.17 and paragraph 1.18, seller expressly makes no representation that, at the closing the maintenance charge for the unit will not have increased or that an assessment will not be imposed or increased.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

45. Purchaser represents that Purchaser has sufficient funds including financing amount, without sale of any current residence, to pay Balance of the Purchase Price and closing costs at Closing and to comply with Purchaser's obligations hereunder.

46. In the event party actually receives a tax abatement and/or credit pertaining to the time of the other party's ownership and it is not reassessed by the Corporation, that party agrees to refund such abatement to the other Party. This paragraph shall survive Closing for one (1) year.

47. Intentionally omitted

48. Wherever the terms of this Contract require that written notice be delivered by or the either party hereto, such notice by or to said party's attorney shall be deemed sufficient.

49. Before either party claims entitlement to any remedy to which he or she may be entitled arising from a breach of Contract except with respect to the closing date, the non-breaching party shall first provide the breaching party with notice of the breach and a five (5) calendar days opportunity to cure.

50. Seller shall not be required to bring any action or proceeding or otherwise incur any expense to transfer title to the Shares and Leases as required under this Contract, except that Seller shall pay from the Purchase Price all liens and judgements against the Unit which have reduced to an amount certain.

51. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, The Bankruptcy Code of New York State. The sole venue for any dispute arising under this Contract shall be Bankruptcy Court: Eastern District, New York.

52. Dowpayment in Escrow.
    (a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank account at TD Bank until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in a non-interest-bearing account for the benefit of the parties. The Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law.
    The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

either party gives Notice to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such party to the proposed payment of the Downpayment within 10 business days after thr giving of such Notice, Escrowwee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect no to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgement, order or decree of a court.

However, Escrowee shall have the right at any time to deposit, the Downpayment and the interest thereon with the clerk of a court in the county in which the Unit is located and shall give Notice of such deposit to Seller(s) and Purchaser(s). Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of any further obligations and responsibilities hereunder.

(b) The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller(s) and Purchaser(s) jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the to the provisions of this paragraph by signing in the place indicated on the signature page of this Rider. Escrowee shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee. The party whose attorney is Escrowee shall be liable for any loss of the Downpayment by the Escrowee.

53. Purchaser and seller understand that this contract and rider are subject to an executed and compliant stipulation and agreement and Regulatory Agreement filed in the Bankruptcy Court: Eastern District of New York, Case No: 18-45044-nhl which document shall control if there are in conflicts.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

54. The Seller shall have the right to remain in possession for a period of forty-five (45) days after the actual closing of title and delivery of deed upon depositing in escrow with Seller attorney the sum of forty thousand dollars ($40,000) in ensure delivery of possession. In the event Seller fails to leave the premises by the end of said period, Seller attorney is authorized to pay Purchaser as use and occupancy the sum of $2,000.00 per month for each month or portion thereof the seller remains in possession beyond said period. Said payment shall not create a landlord/tenant relationship. The seller attorneys are authorized to release the funds held in escrow seventy-two (72) hours after written notification of the purchaser or their attorney. This provision shall survive delivery of the deed.

55. The Purchase has reviewed the Seller's lease, Certificate of Incorporation, By-Laws, and corporate resolution to sell. Purchaser shall receive the Proprietary Lease, Certificate of Incorporation, By-Laws, and consent to sell by August 14, 2020 at 5 PM.

**For Purchaser:**                                        **For Seller:**

DocuSigned by:

_____        _____
751886A9D47145F...

Mildred Williams                                          1516 Bedford Ave LLC

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

Contract of sale cooperative apartment, 7-2001
Prepared by the Committee on Condominium and Cooperative of the Real Property Section of the New York State Bar Association

## CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

# <u>Contract of Sale - Cooperative Apartment</u>

This Contract is made as of August , 2020 ·····: between the "Seller" and the "Purchaser" identified below.

### 1 Certain Definitions and Information
1.1 The "Parties" are:

**1.1.1 "Seller":** Jermaine Anthony
*Prior names used by Seller:*
*Address: 1516 Bedford Avenue, Apt 2B, Broolyn, NY*

*S.S. No.:*

**1.1.2 "Purchaser":** 1516 Bedford Ave LLC

*Address: 70 Lyman Place, Staten Island, NY 10304*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax):*

1.2.1 "Seller's Attorney"
Angelyn Johnson,Esq
26 Court Street, Suite 2810
Brooklyn, New York 11201
(718) 875-2145 Fax:(718) 875-9318
Email: ajohnson@adj-law.com
1.3 The "Escrowee" is *the Seller* Attorney.

1.2.2 "Purchaser's Attorney"
Frederick C. Biehl III, Esq.
75 Eisenhower Parkway
Roseland, NJ 07068
(973-364-0111 Fax: (973) 364-1073
fbiehl@shsbmlaw.com

1.4 The Managing Agent is *(name. address and telephone, fax):N/A*
1.5 The real estate "Broker(s)" (see ¶ 12) is/are: none1.6 The name of the cooperative housing corporation ("Corporation") is: 1516 Bedford Avenue HDFC
1.7 The "Unit" number is: 2B
1.8 The Unit is located in "Premises" known as: 1516 Bedford Avenue, Brooklyn, NY
1.9 The "Shares" are the 250 shares of the Corporation allocated to the Unit.
1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on
1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and
1.12 Specifically excluded from this sale is all personal property not included in ¶ 1.11 and
1.13 The sale *[does]* [~~does not~~] include Seller's interest in *[Storage]*/ *[Servant's Room]*/ *[Parking Space]* ("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Lease.
1.15 The date scheduled for Closing is Court Approved Date ("Scheduled Closing Date") at      (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: $106,250.00 or more
1.16.1 The "Contract Deposit" is: $65,000.00
1.16.2 The "Balance" of the Purchase Price due at Closing is: $41,250.00 (See ¶ 2.2.2)
1.17 The monthly "Maintenance" charge is $ N/A    (See ¶4)
1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is $0 , payable as follows:

1.19 *[Seller]* *[Purchaser]* shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.
1.20 Financing Options (*Delete two of the following ¶¶ 1.20.1, 1.20.2 or 1.20.3*)
1.20.1 ~~Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~
1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment letter.
1.20.3 ~~Purchaser shall not apply for financing in connection with this sale.~~
1.21 ~~If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $      for a term of      years or such lesser amount or shorter term as applied for or acceptable to Purchaser; and the "Loan Commitment Date" for ¶ 18 is      calendar days after the Delivery Date.~~
1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.
1.23 All "Proposed Occupants" of the Unit are: N/A
1.23.1 persons and relationship to Purchaser: N/A
1.23.2 pets:
1.24 The Contract Deposit shall be held in [a non-] [an] IOLA escrow account. If the account is a non- IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at Depository:
Address: TD Bank 211 Montague Street, Brooklyn, New York 11201 (See ¶ 27)
1.25 This Contract is [not] continued on attached rider(s).
### 2 Agreement to Sell and Purchase; Purchase Price; Escrow
2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale,

for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract by Purchaser's good check to the order of Escrowee; and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

**3 Personalty**

3.1 Subject to any rights of the Corporation or any holder of a mort-gage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.

3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

**4 Representations and Covenants**

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17and l.l8;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;

4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase.

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

**5 Corporate Documents**

~~Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).~~

**6 Required Approval and References**

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is

refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct. Purchaser shall be in default and ¶ 13.1 shall govern.

### 7 Condition of Unit and Personalty; Possession

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

### 8 Risk of Loss

8.1 The provisions of General Obligations Law § 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL § 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

### 9 Closing Location

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

### 10 Closing

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

### 11 Closing Fees, Taxes and Apportionments

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax"),

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and anyother periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank,

certified or attorney's escrow check. This ¶11.6 shall survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate agreement The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

**13 Defaults, Remedies and Indemnities**

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

**14 Entire Agreement; Modification**

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement. 14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

**15 Removal of Liens and Judgments**

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

**16 Seller's Inability**

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

**17 Notices and Contract Delivery**

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand. Overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶ 17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

**18 Financing Provisions**

18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ l.20.1or l.20.2 applies.

18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.

18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

18.2.1 apply only to an Institutional Lender for a loan on the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information, and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one Institutional Lender.

18.3 If ¶ 1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment

Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent bv then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶18.3.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and except as set forth in ¶ 12. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and

inspection expenses and other sums reimbursable pursuant to ¶ 16.

18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:

18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or

18.3.7.2 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.

**19 Singular/Plural and Joint/Several**

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

**20 No Survival**

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

**21 Inspections**

Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

## 22 Governing Law and Venue

This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

## 23 No Assignment by Purchaser; Death of Purchaser

23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in ¶ 12.

## 24 Cooperation of Parties

24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain, execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

## 25 FIRPTA

The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non- Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

## 26 Additional Requirements

26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending *in rem* action, tax certificate/lien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party way cancel this Contract (pursuant to ¶ 16.3) by Notice.

## 27 Escrow Terms

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute. Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys elected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract

## 28 Margin Headings

The margin heading do not constitute part of the text of this Contract.

## 29 Miscellaneous

This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind

and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

## 30 Lead Paint

If applicable, the complete and fully executed Disclosure of Information on Lead Based Paint and or Lead-Based Paint Hazards is attached hereto and made a part hereof.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

**In Witness Whereof**, the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:          SELLER:                          PURCHASER:

_____          _____          _____
                    ESCROWEE         Jermaine Anthony                 1516 Bedford Ave LLC

                                     _____          _____

                                     _____          _____

                                     _____          _____

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

<u>RIDER TO CONTRACT OF SALE</u>

SELLER:       Jermaine Anthony

PURCHASER: 1516 Bedford Ave LLC

PREMISES:     1516 Bedford Avenue, Unit 2B, Brooklyn, NY 11216

31. **In the event of any inconsistency between Bankruptcy Settlement Stipulation under Case No: 18-45044-nhl, provisions of this rider, and those contained in the printed contract of sale to which it is attached, the provisions of this rider shall supercede such inconsistent provisions of the printed contract.**

32. This Contract shall not bind the parties until they each have signed it, and a fully executed copy has been delivered to the Purchaser's attorney.

33. The Parties agree that this Contract may be executed in PDF, facsimile or original signature counterparts, each of which shall be deemed an original, and all which, taken together, shall constitute but one and the same instrument which may be sufficiently evidenced by one counterpart. The Parties further agree that PDF and/or facsimile signatures and copies of this Contract shall be considered legal and binding for purposes of this Contract of Sale.

34. Notice to either party's attorney may be made by electronic delivery by Email, if to the Seller's attorney, to ajohnson@adj-law.com and if to the Purchaser's attorney, to fbiehl@shsbmlaw.com.

35. Supplementing paragraph 1, Purchaser is purchasing the Unit in its present "as is" condition, and that Seller shall have no responsibility to make any improvements, repairs or decorations to the Unit or its equipment, appliances and fixtures prior to closing except as otherwise set forth herein. Seller does not warrant nor guarantee the continued performance of any of the equipment, appliances and fixtures for any period after the Closing.

36. Seller shall not be responsible for or obligated to repair holes.

37. Intentionally omitted

38. Supplementing paragraphs 2 and 13.4, purchaser and any maker of the uncollected instrument for payment of the contract deposit, or any uncollected instrument for the balance of the purchase piece due to seller at closing, shall be jointly and severally liable for the unpaid amount thereof. Purchaser agrees to

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

indemnify seller for all costs of collection thereof including, without limitation, reasonable attorney fees and disbursements, court costs and litigation expenses. The provisions of this paragraph shall survive the closing.

39. Supplementing paragraph 14, purchaser acknowledges having entered into this contract without relying on any claims, promises, statements, estimates, representations, warranties, conditions, broker's documents or other inducements are deemed by the parties to be merged in this Contract.

40. Any increase in maintenance, change in flip tax calculations and/or the imposition of any special assessment following the full execution of this Contract shall not be deemed a misrepresentation or breach by Seller, and shall not relieve Purchaser's obligations hereunder.

41. The acceptance of the shares and assumption of the lease by the purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part on the seller to be performed pursuant to the provisions of this agreement, except those expressly provided to survive the closing.

42. In the event purchaser obtains a title report with respect to the unit or the premises, purchaser shall promptly forward to seller's attorney a copy of such title report and each continuation or supplement thereto, and shall, in writing, specifically identify each objection and exception as to which purchaser requests action by seller and specify the action requested. The delivery of title report shall constitute notice of objection.

43. Supplementing paragraph 21 : Purchaser agrees to indemnify, defend and hold Seller harmless against any losses, damage, claims, costs or expenses for injuries to persons or property, including without limitation , the property of Seller, arising out of the acts or actions of Purchaser, its agents, contractors, decorators, representatives or invitees, Seller shall have no obligation to repair same and may convey same to Purchaser subject to such damage, Purchaser's agreement to indemnify Seller shall survive closing or the earlier termination of this Contract.

44. Supplementing paragraph 4: Without limiting seller's representation as to the amount set forth in paragraph 1.17 and paragraph 1.18, seller expressly makes no representation that, at the closing the maintenance charge for the unit will not have increased or that an assessment will not be imposed or increased.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

45. Purchaser represents that Purchaser has sufficient funds including financing amount, without sale of any current residence, to pay Balance of the Purchase Price and closing costs at Closing and to comply with Purchaser's obligations hereunder.

46. In the event party actually receives a tax abatement and/or credit pertaining to the time of the other party's ownership and it is not reassessed by the Corporation, that party agrees to refund such abatement to the other Party. This paragraph shall survive Closing for one (1) year.

47. Intentionally omitted

48. Wherever the terms of this Contract require that written notice be delivered by or the either party hereto, such notice by or to said party's attorney shall be deemed sufficient.

49. Before either party claims entitlement to any remedy to which he or she may be entitled arising from a breach of Contract except with respect to the closing date, the non-breaching party shall first provide the breaching party with notice of the breach and a five (5) calendar days opportunity to cure.

50. Seller shall not be required to bring any action or proceeding or otherwise incur any expense to transfer title to the Shares and Leases as required under this Contract, except that Seller shall pay from the Purchase Price all liens and judgements against the Unit which have reduced to an amount certain.

51. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, The Bankruptcy Code of New York State. The sole venue for any dispute arising under this Contract shall be Bankruptcy Court: Eastern District, New York.

52. Dowpayment in Escrow.
   (a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank account at TD Bank until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in a non-interest-bearing account for the benefit of the parties. The Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law.
   The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

either party gives Notice to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such party to the proposed payment of the Downpayment within 10 business days after thr giving of such Notice, Escrowwee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect no to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgement, order or decree of a court.

However, Escrowee shall have the right at any time to deposit, the Downpayment and the interest thereon with the clerk of a court in the county in which the Unit is located and shall give Notice of such deposit to Seller(s) and Purchaser(s). Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of any further obligations and responsibilities hereunder.

(b) The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller(s) and Purchaser(s) jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the to the provisions of this paragraph by signing in the place indicated on the signature page of this Rider. Escrowee shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee. The party whose attorney is Escrowee shall be liable for any loss of the Downpayment by the Escrowee.

53. Purchaser and seller understand that this contract and rider are subject to an executed and compliant stipulation and agreement and Regulatory Agreement filed in the Bankruptcy Court: Eastern District of New York, Case No: 18-45044-nhl which document shall control if there are in conflicts.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

54. The Seller shall have the right to remain in possession for a period of forty-five (45) days after the actual closing of title and delivery of deed upon depositing in escrow with Seller attorney the sum of forty thousand dollars ($40,000) in ensure delivery of possession. In the event Seller fails to leave the premises by the end of said period, Seller attorney is authorized to pay Purchaser as use and occupancy the sum of $2,000.00 per month for each month or portion thereof the seller remains in possession beyond said period. Said payment shall not create a landlord/tenant relationship. The seller attorneys are authorized to release the funds held in escrow seventy-two (72) hours after written notification of the purchaser or their attorney. This provision shall survive delivery of the deed.

55. The Purchase has reviewed the Seller's lease, Certificate of Incorporation, By-Laws, and corporate resolution to sell. Purchaser shall receive the Proprietary Lease, Certificate of Incorporation, By-Laws, and consent to sell by August 14, 2020 at 5 PM.

**For Purchaser:**                                    **For Seller:**

_____          _____
Jermaine Anthony                                     1516 Bedford Ave LLC

Contract of sale cooperative apartment, 7-2001
Prepared by the Committee on Condominium and Cooperative of the Real Property Section of the New York State Bar Association

## CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

# Contract of Sale - Cooperative Apartment

This Contract is made as of ~~August~~ , 2020 between the "Seller" and the "Purchaser" identified below.

### 1 Certain Definitions and Information

1.1 The "Parties" are:

**1.1.1 "Seller":** Elhassan Hussein
*Prior names used by Seller:*
*Address: 1516 Bedford Avenue, Apt 4A, Broolyn, NY*

*S.S. No.:*

**1.1.2 "Purchaser":** 1516 Bedford Ave LLC

*Address: 70 Lyman Place, Staten Island, NY 10304*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax):*

1.2.1 "Seller's Attorney"
Angelyn Johnson,Esq
26 Court Street, Suite 2810
Brooklyn, New York 11201
(718) 875-2145 Fax:(718) 875-9318
Email: ajohnson@adj-law.com

1.2.2 "Purchaser's Attorney"
Frederick C. Biehl III, Esq.
75 Eisenhower Parkway
Roseland, NJ 07068
(973-364-0111 Fax: (973) 364-1073
fbiehl@shsbmlaw.com

1.3 The "Escrowee" is *the Seller* Attorney.

1.4 The Managing Agent is *(name. address and telephone, fax):N/A*

1.5 The real estate "Broker(s)" (see ¶ 12) is/are: none 1.6 The name of the cooperative housing corporation ("Corporation") is: 1516 Bedford Avenue HDFC

1.7 The "Unit" number is: 4A

1.8 The Unit is located in "Premises" known as: 1516 Bedford Avenue, Brooklyn, NY

1.9 The "Shares" are the 250 shares of the Corporation allocated to the Unit.

1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on

1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and

1.12 Specifically excluded from this sale is all personal property not included in ¶ 1.11 and

1.13 The sale [*does*] [~~does not~~] include Seller's interest in [*Storage*]/ [*Servant's Room*]/ [*Parking Space*] ("Included Interests")

1.14 The "Closing" is the transfer of ownership of the Shares and Lease.

1.15 The date scheduled for Closing is Court Approved Date ("Scheduled Closing Date") at        (See ¶¶ 9 and 10)

1.16 The "Purchase Price" is: $106,250.00 or more

1.16.1 The "Contract Deposit" is: $65,000.00

1.16.2 The "Balance" of the Purchase Price due at Closing is: $41,250.00 (See ¶ 2.2.2)

1.17 The monthly "Maintenance" charge is $N/A        (See ¶ 4)

1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is $0 , payable as follows:

1.19 [*Seller*] [*Purchaser*] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.

1.20 Financing Options (*Delete two of the following* ¶¶ *1.20.1, 1.20.2 or 1.20.3)*

1.20.1 ~~Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~

1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment letter.

1.20.3 ~~Purchaser shall not apply for financing in connection with this sale.~~

1.21 ~~If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $       for a term of       years or such lesser amount or shorter term as applied for or acceptable to Purchaser; and the "Loan Commitment Date" for ¶ 18 is       calendar days after the Delivery Date.~~

1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.

1.23 All "Proposed Occupants" of the Unit are: N/A

1.23.1 persons and relationship to Purchaser: N/A

1.23.2 pets:

1.24 The Contract Deposit shall be held in [a non-] [an] IOLA escrow account. If the account is a non- IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at Depository:
Address: TD Bank 211 Montague Street, Brooklyn, New York 11201 (See ¶ 27)

1.25 This Contract is [not] continued on attached rider(s).

### 2 Agreement to Sell and Purchase; Purchase Price; Escrow

2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale,

for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract by Purchaser's good check to the order of Escrowee; and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

**3 Personalty**

3.1 Subject to any rights of the Corporation or any holder of a mort-gage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.

3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

**4 Representations and Covenants**

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17and l.l8;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;

4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase.

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

**5 Corporate Documents**

~~Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute)~~.

**6 Required Approval and References**

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation’s consent is not issued before such Notice of cancellation is given. If such consent is

refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct. Purchaser shall be in default and ¶ 13.1 shall govern.

**7 Condition of Unit and Personalty; Possession**

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

**8 Risk of Loss**

8.1 The provisions of General Obligations Law § 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL § 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

**9 Closing Location**

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

**10 Closing**

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

**11 Closing Fees, Taxes and Apportionments**

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax"),

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and anyother periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank,

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

certified or attorney's escrow check. This ¶11.6 shall survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate agreement The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

**13 Defaults, Remedies and Indemnities**

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

**14 Entire Agreement; Modification**

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement. 14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

**15 Removal of Liens and Judgments**

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

**16 Seller's Inability**

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

**17 Notices and Contract Delivery**

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand. Overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶

17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

**18 Financing Provisions**

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ l.20.1or l.20.2 applies.

18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.

18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

18.2.1 apply only to an Institutional Lender for a loan on the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information, and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one Institutional Lender.

18.3 If ¶ 1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment

Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶18.3.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and except as set forth in ¶ 12. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and
inspection expenses and other sums reimbursable pursuant to ¶ 16.

18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:

18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or

18.3.7.2 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.

## 19 Singular/Plural and Joint/Several

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

## 20 No Survival

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

## 21 Inspections

Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

## 22 Governing Law and Venue

This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

## 23 No Assignment by Purchaser; Death of Purchaser

23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in ¶ 12.

## 24 Cooperation of Parties

24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain, execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

## 25 FIRPTA

The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non- Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

## 26 Additional Requirements

26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending *in rem* action, tax certificate/lien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party way cancel this Contract (pursuant to ¶ 16.3) by Notice.

## 27 Escrow Terms

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10

business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute. Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys elected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract

## 28 Margin Headings

The margin heading do not constitute part of the text of this Contract.

## 29 Miscellaneous

This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind

and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

## 30 Lead Paint

If applicable, the complete and fully executed Disclosure of Information on Lead Based Paint and or Lead-Based Paint Hazards is attached hereto and made a part hereof.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

**In Witness Whereof**, the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:     SELLER:     PURCHASER:

_____     _____     _____
            ESCROWEE     Elhassan Hussein     1516 Bedford Ave LLC

                 _____     _____

                 _____     _____

                 _____     _____

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

## RIDER TO CONTRACT OF SALE

SELLER:        Elhassan Hussein

PURCHASER: 1516 Bedford Ave LLC

PREMISES:     1516 Bedford Avenue, Unit 4A, Brooklyn, NY 11216

**31. In the event of any inconsistency between Bankruptcy Settlement Stipulation under Case No: 18-45044-nhl, provisions of this rider, and those contained in the printed contract of sale to which it is attached, the provisions of this rider shall supercede such inconsistent provisions of the printed contract.**

32. This Contract shall not bind the parties until they each have signed it, and a fully executed copy has been delivered to the Purchaser's attorney.

33. The Parties agree that this Contract may be executed in PDF, facsimile or original signature counterparts, each of which shall be deemed an original, and all which, taken together, shall constitute but one and the same instrument which may be sufficiently evidenced by one counterpart. The Parties further agree that PDF and/or facsimile signatures and copies of this Contract shall be considered legal and binding for purposes of this Contract of Sale.

34. Notice to either party's attorney may be made by electronic delivery by Email, if to the Seller's attorney, to ajohnson@adj-law.com and if to the Purchaser's attorney, to fbiehl@shsbmlaw.com.

35. Supplementing paragraph 1, Purchaser is purchasing the Unit in its present "as is" condition, and that Seller shall have no responsibility to make any improvements, repairs or decorations to the Unit or its equipment, appliances and fixtures prior to closing except as otherwise set forth herein. Seller does not warrant nor guarantee the continued performance of any of the equipment, appliances and fixtures for any period after the Closing.

36. Seller shall not be responsible for or obligated to repair holes.

37. Intentionally omitted

38. Supplementing paragraphs 2 and 13.4, purchaser and any maker of the uncollected instrument for payment of the contract deposit, or any uncollected instrument for the balance of the purchase piece due to seller at closing, shall be jointly and severally liable for the unpaid amount thereof. Purchaser agrees to

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

indemnify seller for all costs of collection thereof including, without limitation, reasonable attorney fees and disbursements, court costs and litigation expenses. The provisions of this paragraph shall survive the closing.

39. Supplementing paragraph 14, purchaser acknowledges having entered into this contract without relying on any claims, promises, statements, estimates, representations, warranties, conditions, broker's documents or other inducements are deemed by the parties to be merged in this Contract.

40. Any increase in maintenance, change in flip tax calculations and/or the imposition of any special assessment following the full execution of this Contract shall not be deemed a misrepresentation or breach by Seller, and shall not relieve Purchaser's obligations hereunder.

41. The acceptance of the shares and assumption of the lease by the purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part on the seller to be performed pursuant to the provisions of this agreement, except those expressly provided to survive the closing.

42. In the event purchaser obtains a title report with respect to the unit or the premises, purchaser shall promptly forward to seller's attorney a copy of such title report and each continuation or supplement thereto, and shall, in writing, specifically identify each objection and exception as to which purchaser requests action by seller and specify the action requested. The delivery of title report shall constitute notice of objection.

43. Supplementing paragraph 21 : Purchaser agrees to indemnify, defend and hold Seller harmless against any losses, damage, claims, costs or expenses for injuries to persons or property, including without limitation , the property of Seller, arising out of the acts or actions of Purchaser, its agents, contractors, decorators, representatives or invitees, Seller shall have no obligation to repair same and may convey same to Purchaser subject to such damage, Purchaser's agreement to indemnify Seller shall survive closing or the earlier termination of this Contract.

44. Supplementing paragraph 4: Without limiting seller's representation as to the amount set forth in paragraph 1.17 and paragraph 1.18, seller expressly makes no representation that, at the closing the maintenance charge for the unit will not have increased or that an assessment will not be imposed or increased.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

45. Purchaser represents that Purchaser has sufficient funds including financing amount, without sale of any current residence, to pay Balance of the Purchase Price and closing costs at Closing and to comply with Purchaser's obligations hereunder.

46. In the event party actually receives a tax abatement and/or credit pertaining to the time of the other party's ownership and it is not reassessed by the Corporation, that party agrees to refund such abatement to the other Party. This paragraph shall survive Closing for one (1) year.

47. Intentionally omitted

48. Wherever the terms of this Contract require that written notice be delivered by or the either party hereto, such notice by or to said party's attorney shall be deemed sufficient.

49. Before either party claims entitlement to any remedy to which he or she may be entitled arising from a breach of Contract except with respect to the closing date, the non-breaching party shall first provide the breaching party with notice of the breach and a five (5) calendar days opportunity to cure.

50. Seller shall not be required to bring any action or proceeding or otherwise incur any expense to transfer title to the Shares and Leases as required under this Contract, except that Seller shall pay from the Purchase Price all liens and judgements against the Unit which have reduced to an amount certain.

51. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, The Bankruptcy Code of New York State. The sole venue for any dispute arising under this Contract shall be Bankruptcy Court: Eastern District, New York.

52. Dowpayment in Escrow.
(a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank account at TD Bank until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in a non-interest-bearing account for the benefit of the parties. The Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law.
The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

either party gives Notice to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such party to the proposed payment of the Downpayment within 10 business days after thr giving of such Notice, Escrowwee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect no to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgement, order or decree of a court.

However, Escrowee shall have the right at any time to deposit, the Downpayment and the interest thereon with the clerk of a court in the county in which the Unit is located and shall give Notice of such deposit to Seller(s) and Purchaser(s). Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of any further obligations and responsibilities hereunder.

(b) The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller(s) and Purchaser(s) jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the to the provisions of this paragraph by signing in the place indicated on the signature page of this Rider. Escrowee shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee. The party whose attorney is Escrowee shall be liable for any loss of the Downpayment by the Escrowee.

53. Purchaser and seller understand that this contract and rider are subject to an executed and compliant stipulation and agreement and Regulatory Agreement filed in the Bankruptcy Court: Eastern District of New York, Case No: 18-45044-nhl which document shall control if there are in conflicts.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

54. The Seller shall have the right to remain in possession for a period of forty-five (45) days after the actual closing of title and delivery of deed upon depositing in escrow with Seller attorney the sum of forty thousand dollars ($40,000) in ensure delivery of possession. In the event Seller fails to leave the premises by the end of said period, Seller attorney is authorized to pay Purchaser as use and occupancy the sum of $2,000.00 per month for each month or portion thereof the seller remains in possession beyond said period. Said payment shall not create a landlord/tenant relationship. The seller attorneys are authorized to release the funds held in escrow seventy-two (72) hours after written notification of the purchaser or their attorney. This provision shall survive delivery of the deed.

55. The Purchase has reviewed the Seller's lease, Certificate of Incorporation, By-Laws, and corporate resolution to sell. Purchaser shall receive the Proprietary Lease, Certificate of Incorporation, By-Laws, and consent to sell by August 14, 2020 at 5 PM.

**For Purchaser:**

**For Seller:**

_____

_____

Elhassan Hussein

1516 Bedford Ave LLC

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

Contract of sale cooperative apartment, 7-2001
Prepared by the Committee on Condominium and Cooperative of the Real Property Section of the New York State Bar Association

## CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale - Cooperative Apartment

This Contract is made as of August        , 2020       between the "Seller" and the "Purchaser" identified below.

### 1 Certain Definitions and Information
1.1 The "Parties" are:

**1.1.1 "Seller":** Edward Gray
*Prior names used by Seller:*
*Address: 1516 Bedford Avenue, Apt 4D Broolyn, NY*

*S.S. No.:*

**1.1.2 "Purchaser":** 1516 Bedford Ave, LLC

*Address: 70 Lyman Place, Staten Island, NY 10304*

*S.S. No.:*

1.2 The "Attorneys" are *(name, firm name, address and telephone, fax):*
1.2.1 "Seller's Attorney"
Angelyn Johnson,Esq
26 Court Street, Suite 2810
Brooklyn, New York 11201
(718) 875-2145 Fax:(718) 875-9318
Email: ajohnson@adj-law.com
1.3 The "Escrowee" is *the Seller* Attorney.

1.2.2 "Purchaser's Attorney"
Frederick C. Biehl III, Esq.
75 Eisenhower Parkway
Roseland, NJ 07068
(973-364-0111 Fax: (973) 364-1073
fbiehl@shsbmlaw.com

1.4 The Managing Agent is *(name. address and telephone, fax):N/A*
1.5 The real estate "Broker(s)" (see ¶ 12) is/are: none1.6 The name of the cooperative housing corporation ("Corporation") is: 1516 Bedford Avenue HDFC
1.7 The "Unit" number is: 4D
1.8 The Unit is located in "Premises" known as: 1516 Bedford Avenue, Brooklyn, NY
1.9 The "Shares" are the 250 shares of the Corporation allocated to the Unit.
1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on
1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶ 1.12 and
1.12 Specifically excluded from this sale is all personal property not included in ¶ 1.11 and
1.13 The sale *[does]* [~~does not~~] include Seller's interest in *[Storage]*/ *[Servant's Room]*/ *[Parking Space]* ("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Lease.
1.15 The date scheduled for Closing is Court Approved Date ("Scheduled Closing Date") at        (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: $106,250.00 or more
1.16.1 The "Contract Deposit" is: $65,000.00
1.16.2 The "Balance" of the Purchase Price due at Closing is: $41,250.00 (See ¶ 2.2.2)
1.17 The monthly "Maintenance" charge is $N/A    (See ¶ 4)
1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is $0 , payable as follows:

1.19 *[Seller]* *[Purchaser]* shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.
1.20 Financing Options (*Delete two of the following* ¶¶ *1.20.1, 1.20.2 or 1.20.3*)
1.20.1 ~~Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~
1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment letter.
1.20.3 ~~Purchaser shall not apply for financing in connection with this sale.~~
1.21 ~~If ¶¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 are: a loan of $     for a term of     years or such lesser amount or shorter term as applied for or acceptable to Purchaser; and the "Loan Commitment Date" for ¶ 18 is     calendar days after the Delivery Date.~~
1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.
1.23 All "Proposed Occupants" of the Unit are: N/A
1.23.1 persons and relationship to Purchaser: N/A
1.23.2 pets:
1.24 The Contract Deposit shall be held in [a non-] [an] IOLA escrow account. If the account is a non- IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at Depository:
Address: TD Bank 211 Montague Street, Brooklyn, New York 11201 (See ¶ 27)
1.25 This Contract is [not] continued on attached rider(s).
**2 Agreement to Sell and Purchase; Purchase Price; Escrow**
2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale,

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract by Purchaser's good check to the order of Escrowee; and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

**3 Personalty**

3.1 Subject to any rights of the Corporation or any holder of a mort-gage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.

3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

**4 Representations and Covenants**

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17and l.l8;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;

4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase.

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

**5 Corporate Documents**

~~Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).~~

**6 Required Approval and References**

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct. Purchaser shall be in default and ¶ 13.1 shall govern.

## 7 Condition of Unit and Personalty; Possession

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

## 8 Risk of Loss

8.1 The provisions of General Obligations Law § 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL § 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing.

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

## 9 Closing Location

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

## 10 Closing

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 If requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

## 11 Closing Fees, Taxes and Apportionments

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax"),

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and anyother periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank,

certified or attorney's escrow check. This ¶11.6 shall survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

## 12 Broker

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate agreement The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

## 13 Defaults, Remedies and Indemnities

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, fifteen thousand dollars from if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

## 14 Entire Agreement; Modification

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement. 14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

## 15 Removal of Liens and Judgments

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

## 16 Seller's Inability

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

## 17 Notices and Contract Delivery

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand. Overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶

17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

## 18 Financing Provisions

18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ l.20.1or l.20.2 applies.

18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.

18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

18.2.1 apply only to an Institutional Lender for a loan on the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information, and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one Institutional Lender.

18.3 If ¶ 1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment

Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent bv then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶18.3.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and except as set forth in ¶ 12. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and

inspection expenses and other sums reimbursable pursuant to ¶ 16.

18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:

18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or

18.3.7.2 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.

**19 Singular/Plural and Joint/Several**

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

**20 No Survival**

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

**21 Inspections**

Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

## 22 Governing Law and Venue

This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

## 23 No Assignment by Purchaser; Death of Purchaser

23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in ¶ 12.

## 24 Cooperation of Parties

24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain, execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

## 25 FIRPTA

The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non- Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

## 26 Additional Requirements

26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending *in rem* action, tax certificate/lien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party way cancel this Contract (pursuant to ¶ 16.3) by Notice.

## 27 Escrow Terms

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10

business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute. Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys elected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract

## 28 Margin Headings

The margin heading do not constitute part of the text of this Contract.

## 29 Miscellaneous

This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶ 17.2 and 17.3. This Contract shall bind

and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

## 30 Lead Paint

If applicable, the complete and fully executed Disclosure of Information on Lead Based Paint and or Lead-Based Paint Hazards is attached hereto and made a part hereof.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

**In Witness Whereof**, the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:        SELLER:                    PURCHASER:

_____        _____      _____
                          ESCROWEE        Edward Gray                 1516 Bedford Ave LLC

                                  _____      _____

                                  _____      _____

                                  _____      _____

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

## RIDER TO CONTRACT OF SALE

SELLER:        Edward Gray

PURCHASER: 1516 Bedford Ave LLC

PREMISES:      1516 Bedford Avenue, Unit 4D, Brooklyn, NY 11216

**31. In the event of any inconsistency between Bankruptcy Settlement Stipulation under Case No: 18-45044-nhl, provisions of this rider, and those contained in the printed contract of sale to which it is attached, the provisions of this rider shall supercede such inconsistent provisions of the printed contract.**

32. This Contract shall not bind the parties until they each have signed it, and a fully executed copy has been delivered to the Purchaser's attorney.

33. The Parties agree that this Contract may be executed in PDF, facsimile or original signature counterparts, each of which shall be deemed an original, and all which, taken together, shall constitute but one and the same instrument which may be sufficiently evidenced by one counterpart. The Parties further agree that PDF and/or facsimile signatures and copies of this Contract shall be considered legal and binding for purposes of this Contract of Sale.

34. Notice to either party's attorney may be made by electronic delivery by Email, if to the Seller's attorney, to ajohnson@adj-law.com and if to the Purchaser's attorney, to fbiehl@shsbmlaw.com.

35. Supplementing paragraph 1, Purchaser is purchasing the Unit in its present "as is" condition, and that Seller shall have no responsibility to make any improvements, repairs or decorations to the Unit or its equipment, appliances and fixtures prior to closing except as otherwise set forth herein. Seller does not warrant nor guarantee the continued performance of any of the equipment, appliances and fixtures for any period after the Closing.

36. Seller shall not be responsible for or obligated to repair holes.

37. Intentionally omitted

38. Supplementing paragraphs 2 and 13.4, purchaser and any maker of the uncollected instrument for payment of the contract deposit, or any uncollected instrument for the balance of the purchase piece due to seller at closing, shall be jointly and severally liable for the unpaid amount thereof. Purchaser agrees to

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

indemnify seller for all costs of collection thereof including, without limitation, reasonable attorney fees and disbursements, court costs and litigation expenses. The provisions of this paragraph shall survive the closing.

39. Supplementing paragraph 14, purchaser acknowledges having entered into this contract without relying on any claims, promises, statements, estimates, representations, warranties, conditions, broker's documents or other inducements are deemed by the parties to be merged in this Contract.

40. Any increase in maintenance, change in flip tax calculations and/or the imposition of any special assessment following the full execution of this Contract shall not be deemed a misrepresentation or breach by Seller, and shall not relieve Purchaser's obligations hereunder.

41. The acceptance of the shares and assumption of the lease by the purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part on the seller to be performed pursuant to the provisions of this agreement, except those expressly provided to survive the closing.

42. In the event purchaser obtains a title report with respect to the unit or the premises, purchaser shall promptly forward to seller's attorney a copy of such title report and each continuation or supplement thereto, and shall, in writing, specifically identify each objection and exception as to which purchaser requests action by seller and specify the action requested. The delivery of title report shall constitute notice of objection.

43. Supplementing paragraph 21 : Purchaser agrees to indemnify, defend and hold Seller harmless against any losses, damage, claims, costs or expenses for injuries to persons or property, including without limitation , the property of Seller, arising out of the acts or actions of Purchaser, its agents, contractors, decorators, representatives or invitees, Seller shall have no obligation to repair same and may convey same to Purchaser subject to such damage, Purchaser's agreement to indemnify Seller shall survive closing or the earlier termination of this Contract.

44. Supplementing paragraph 4: Without limiting seller's representation as to the amount set forth in paragraph 1.17 and paragraph 1.18, seller expressly makes no representation that, at the closing the maintenance charge for the unit will not have increased or that an assessment will not be imposed or increased.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

45. Purchaser represents that Purchaser has sufficient funds including financing amount, without sale of any current residence, to pay Balance of the Purchase Price and closing costs at Closing and to comply with Purchaser's obligations hereunder.

46. In the event party actually receives a tax abatement and/or credit pertaining to the time of the other party's ownership and it is not reassessed by the Corporation, that party agrees to refund such abatement to the other Party. This paragraph shall survive Closing for one (1) year.

47. Intentionally omitted

48. Wherever the terms of this Contract require that written notice be delivered by or the either party hereto, such notice by or to said party's attorney shall be deemed sufficient.

49. Before either party claims entitlement to any remedy to which he or she may be entitled arising from a breach of Contract except with respect to the closing date, the non-breaching party shall first provide the breaching party with notice of the breach and a five (5) calendar days opportunity to cure.

50. Seller shall not be required to bring any action or proceeding or otherwise incur any expense to transfer title to the Shares and Leases as required under this Contract, except that Seller shall pay from the Purchase Price all  liens and judgements against the Unit which have reduced to an amount certain.

51. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, The Bankruptcy Code of New York State. The sole venue for any dispute arising under this Contract shall be Bankruptcy Court: Eastern District, New York.

52.  Dowpayment in Escrow.
   (a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank account at TD Bank until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in a non-interest-bearing account for the benefit of the parties. The Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law.
   The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

either party gives Notice to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such party to the proposed payment of the Downpayment within 10 business days after thr giving of such Notice, Escrowwee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect no to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgement, order or decree of a court.

However, Escrowee shall have the right at any time to deposit, the Downpayment and the interest thereon with the clerk of a court in the county in which the Unit is located and shall give Notice of such deposit to Seller(s) and Purchaser(s). Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of any further obligations and responsibilities hereunder.

(b) The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller(s) and Purchaser(s) jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the to the provisions of this paragraph by signing in the place indicated on the signature page of this Rider. Escrowee shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee. The party whose attorney is Escrowee shall be liable for any loss of the Downpayment by the Escrowee.

53. Purchaser and seller understand that this contract and rider are subject to an executed and compliant stipulation and agreement and Regulatory Agreement filed in the Bankruptcy Court: Eastern District of New York, Case No: 18-45044-nhl which document shall control if there are in conflicts.

DocuSign Envelope ID: 50CE31A0-BCBB-47A8-A1C3-78D7C98E814D

54. The Seller shall have the right to remain in possession for a period of forty-five (45) days after the actual closing of title and delivery of deed upon depositing in escrow with Seller attorney the sum of forty thousand dollars ($40,000) in ensure delivery of possession. In the event Seller fails to leave the premises by the end of said period, Seller attorney is authorized to pay Purchaser as use and occupancy the sum of $2,000.00 per month for each month or portion thereof the seller remains in possession beyond said period. Said payment shall not create a landlord/tenant relationship. The seller attorneys are authorized to release the funds held in escrow seventy-two (72) hours after written notification of the purchaser or their attorney. This provision shall survive delivery of the deed.

55. The Purchase has reviewed the Seller's lease, Certificate of Incorporation, By-Laws, and corporate resolution to sell. Purchaser shall receive the Proprietary Lease, Certificate of Incorporation, By-Laws, and consent to sell by August 14, 2020 at 5 PM.

**For Purchaser:**                                          **For Seller:**

DocuSigned by:

_____          _____
751886A9D47145F...

Edward Gray                                              1516 Bedford Ave LLC

# <u>EXHIBIT B</u>

# REGULATORY AGREEMENT
## (Article XI)

**THIS REGULATORY AGREEMENT** (this "Agreement") entered into as of _____ __, 2020 between **1516 BEDFORD AVENUE, LLC**, a New York limited liability company, having its principal office at **[_____]** (the "Owner"), and **THE CITY OF NEW YORK** (the "City"), a New York municipal corporation acting by and through its Department of Housing Preservation and Development, having its principal office at 100 Gold Street, New York, New York 10038 ("HPD").

**WHEREAS**, Owner intends to acquire the record fee estate or interest in and to the premises, including the land and improvements thereon, described in **<u>Exhibit A</u>** annexed hereto and made a part hereof (the "Premises"); and

**WHEREAS**, the Premises contains 16 units of rental housing (the "Project"); and

**WHEREAS,** to induce HPD to consent to the sale of the Premises to the Owner, HPD requires Owner, among other conditions, to agree that the Premises be restricted in the manner hereinafter provided.

**NOW THEREFORE**, in consideration of the terms, conditions and covenants hereinafter set forth, the parties agree as follows:

1.  <u>Definitions.</u>   For the purposes of this Agreement, the following terms shall have the meanings set forth below:

    "100% of AMI" shall mean 200% of the income levels as modified by household size for the New York metropolitan statistical area for fifty percent (50%) of median income families (a.k.a. as "very low income families") as determined from time to time by HUD under Section 8 of the United States Housing Act of 1937 (or, if such program is terminated, under such program as was in effect immediately before such termination).

    "120% of AMI" shall mean 240% of the income levels as modified by household size for the New York metropolitan statistical area for fifty percent (50%) of median income families (a.k.a. as "very low income families") as determined from time to time by HUD under Section 8 of the United States Housing Act of 1937 (or, if such program is terminated, under such program as was in effect immediately before such termination).

    "Actual Rent" shall mean, for each Unit, the total rent provided in the lease of such Unit including, if applicable, the rent paid by the tenant and any rental subsidy received through Rental Assistance, as calculated in accordance with this Agreement.

    "Administrative Code" shall mean the New York City Administrative Code, any successor statute, and the regulations promulgated in connection therewith.

    "AMI" shall mean the area median income for the primary metropolitan statistical area as determined by HUD from time to time for a family of four, as adjusted for family size. Incomes shall be adjusted for family size as follows: Units with no bedrooms shall be treated as being occupied by a one person family, and Units with one or more bedrooms shall be treated as being occupied by 1.5 persons per bedroom, regardless of the actual number of persons occupying the Unit.

1

"Annual Income" is the anticipated total income from all sources to be received by the household head and spouse and by each additional member of the household, including all net income derived from assets, for the twelve (12) month period following the date of initial determination of income.  The definitions and descriptions of income set forth in the HUD regulations contained in 24 CFR 5.609 or any successor regulations shall apply for the purposes of this Agreement and shall be incorporated herein.

"Applicable AMI Rent" shall mean for a 120% of AMI Unit, 30% of 100% of AMI.

"City Register" shall mean the Office of the City Register of the City of New York for Kings County.

"Current Tenant" shall mean a tenant who is in legal occupancy of a Unit prior to the date of this Agreement, regardless of such tenant's Annual Income. An occupant such as a squatter or licensee is not a Current Tenant.

"Debt Service" shall mean monthly payments of principal and interest for the proposed loan.

"Debt Service Coverage Ratio" shall mean, at any time, the percentage determined by dividing the Net Operating Income for the previous twelve (12) months (or, if justifiably greater or less, the Net Operating Income projected for the next twelve (12) months) by the aggregate payments required (or projected to be required) to be made with respect to debt secured by the Premises during the next twelve (12) months. If any such payments are based on a floating rate of interest, the Debt Service Coverage Ratio will be calculated using the rate projected to be charged by a Lender.

"Eligible Tenant" shall mean (i) a Current Tenant, or (ii) a tenant who meets the income restrictions and other requirements set forth in this Agreement.

"HCR" shall mean the New York State Division of Housing and Community Renewal or its successor agency with jurisdiction over enforcing the Rent Stabilization Code.

"HUD" shall mean the United States Department of Housing and Urban Development or its successors.

"Legal Rent" shall mean, for any Unit, the initial legal regulated rent, as thereafter adjusted pursuant to the Rent Stabilization Code.

"Loan-to-Value Ratio" shall mean, at any time, the percentage determined by dividing the aggregate outstanding balance of all loans secured by the Premises and the amount of the proposed loan, by the appraised value of the Premises then determined by an independent real estate appraiser not affiliated with Owner or the proposed Lender.

"Marketing Handbook" shall mean the "*Marketing Handbook: Policies and Procedures for Resident Selection and Occupancy*" adopted by HPD and New York City Housing Development Corporation and published on the HPD website, as amended.

"<u>Net Operating Income</u>" shall mean, at any time, all revenue generated (or projected to be generated) from the Premises minus all necessary Operating Expenses incurred (or projected to be incurred).

"<u>Operating Expenses</u>" shall mean the ordinary expenses incurred in the operation of the Project including Debt Service, but excluding all non-cash expenses such as depreciation.

"<u>Rental Assistance</u>" shall mean rental subsidies provided through Section 8 or any similar rental subsidy program approved by HPD in its sole discretion.

"<u>Rental Assistance Rent</u>" shall mean the total rent permitted to be collected by Owner under the applicable Rental Assistance program. For example, in the case of any Unit occupied by a tenant with a Section 8 voucher, the Unit will be deemed a Rental Assistance Unit and the Rental Assistance Rent shall be the voucher payment standard as authorized by the government agency issuing the voucher

"<u>Rental Assistance Tenant</u>" shall mean any tenant receiving Rental Assistance.

"<u>Rental Assistance Unit</u>" shall mean a Unit occupied by a Rental Assistance Tenant.

"<u>Rent Stabilization Code</u>" or "<u>Rent Stabilization</u>" shall mean Title 26, Chapter 4 of the Administrative Code (and any successor statute) and the regulations promulgated in connection therewith.

"<u>Section 8</u>" shall mean a federal rental subsidy pursuant to the Section 8 Project-Based Rental Assistance Program, the Section 8 Voucher Program, the Section 8 Certificate Program, the Section 8 Project-Based Voucher Program, or any successor programs under the United States Housing Act of 1937.

"<u>Unit</u>" or "<u>unit</u>" shall mean a dwelling unit of the Project on the Premises.

2.    <u>Restriction Period</u>.

The term of this Agreement shall commence from the date of this Agreement and expire on a date, which is Twenty-Five (25) years from the Effective Date (such period being the "<u>Restriction Period</u>").


4.    <u>Eligibility of Tenants.</u>

A.    Owner shall lease all Units becoming vacant during the Restriction Period only to tenants whose Annual Incomes upon initial occupancy do not exceed 120% of AMI (the "<u>120% of AMI Units</u>");

B.    <u>Changes in Income</u>.  Any Eligible Tenant shall be entitled to remain in occupancy and to obtain a renewal lease in accordance with the Rent Stabilization Code, notwithstanding that such tenant's Annual Income, after initial occupancy, may exceed the maximum for initial eligibility.  Further, no Eligible Tenant shall be evicted or its tenancy terminated except for good cause.

C.      <u>Income Determinations</u>.  In order to determine whether a prospective tenant of a Unit is an Eligible Tenant, Owner shall ascertain the Annual Income of such tenant's household.  Owner may consult with HPD to obtain advice and guidance with respect to income determinations.  Owner must retain all records and documents relating to Owner's determination for a minimum of six (6) years after the date such tenant commences occupancy.  Owner shall provide in each lease executed after the date hereof for the termination of the lease and eviction of the tenant if the tenant falsely or fraudulently certifies income to Owner.

E.      <u>Proof of Compliance.</u>  Owner shall submit to HPD no later than thirty (30) days after the date hereof and thereafter annually upon a date provided by HPD's Division of Asset Management or its successor until the end of the Restriction Period (i) a certified rent roll for all the Units, (ii) at HPD's request, copies of leases for all the Units; (iii) a written certification setting forth the Annual Incomes of all tenants of Units who began occupancy during the prior year (or if prior to the first anniversary of the date hereof, during the period beginning on the date hereof and ending on the date of such certification) as of the date of initial occupancy, and, at HPD's request, all supporting documentation for such income determination, and (iv) a written certification that every tenant who began occupancy of a Unit during the prior year (or if prior to the first anniversary of the date hereof, during the period beginning on the date hereof and ending on the date of such certification) met the income requirements hereunder as of the date of initial occupancy.

F.      <u>Rental Assistance.</u>  Owner shall not refuse to lease a Unit to a holder of a voucher or certificate for Rental Assistance by reason of the status of the prospective tenant as such a holder.

5.      <u>Rent Requirements.</u>

A.      <u>Rents Charged</u>.  During the Restriction Period:

(a)      <u>Current Tenants.</u> All Current Tenants, regardless of Annual Income, shall have the right to remain in occupancy of their Units. Following registration of the initial legal regulated rent, Owner shall offer all Current Tenants rent-stabilized leases in accordance with the Rent Stabilization Code, pursuant to which the Actual Rent shall be the greater of (1) the Actual Rent payable for such Unit under the current lease ("Existing Lease") and (2) 30% of the Current Tenant's Annual Income, or such lesser amount as shall be determined by Owner, but not less than the rent payable under the expiring Existing Lease and not more than the Legal Rent. The Actual Rent for each Unit leased by a Current Tenant upon lease renewal shall not exceed the lesser of (1) the Legal Rent and (2) the prior Actual Rent increased as permitted by the Rent Stabilization Code.

(b)      <u>Upon Vacancy</u>.  The Actual Rent for each Unit, which is or becomes vacant during the Restriction Period (other than a Rental Assistance Unit) shall not exceed the lesser of (1) the Legal Rent and (2) the Applicable AMI Rent. For a Rental Assistance Unit, the Actual Rent shall not exceed the lesser of (1) the Legal Rent and (2) the Rental Assistance Rent, provided that the share of the Rental Assistance Rent payable by such

tenant does not exceed the amount allowed by the applicable Rental Assistance program.

(c)     <u>Lease Renewal</u>.   The Actual Rent for each Unit (other than a Rental Assistance Unit or a Unit leased by a Current Tenant) upon lease renewal shall not exceed the least of (1) the Legal Rent, (2) the Applicable AMI Rent, and (3) the prior Actual Rent increased as permitted by the Rent Stabilization Code. For a Rental Assistance Unit, the Actual Rent upon lease renewal shall not exceed the lesser of (1) the Legal Rent and (2) the Rental Assistance Rent, provided that the share of the Rental Assistance Rent payable by such tenant does not exceed the amount allowed by the applicable Rental Assistance program.

(d)     <u>After the Restriction Period</u>.   Following the expiration of the Restriction Period:

    (1)     Actual Rents for Units occupied by tenants (other than Rental Assistance Tenants) who began occupancy prior to the expiration of the Restriction Period shall be the lesser of (i) the Legal Rent and (ii) the most recent Actual Rent charged to such tenants, which may thereafter be adjusted pursuant to the Rent Stabilization Code or any successor statute.

    (2)     Actual Rents for Units occupied by Rental Assistance Tenants who began occupancy prior to the expiration of the Restriction Period shall not exceed the lesser of (i) the Legal Rent and (2) the Rental Assistance Rent for so long as such tenant remains in occupancy of such Unit, provided that the share of the rent payable by the tenant shall not exceed the amount allowed by the applicable Rental Assistance program.

    (3)     Actual Rents for vacant Units shall not exceed the Legal Rent.

This subparagraph (d) shall survive the expiration or earlier termination of this Agreement.

(e)     Notwithstanding anything to the contrary contained herein, Owner may charge a lower rent for a Unit than otherwise allowed hereunder if the lower rent does not endanger the financial viability of the Project.

B.     <u>Registration in Accordance With Rent Stabilization Code.</u>

(a)     No later than thirty (30) days following the date hereof, Owner shall register the rents for each Unit in accordance with the Rent Stabilization Code at the Initial Rents listed on **<u>Exhibit C</u>** attached hereto.

(b)     The rents for all Units shall continue to be properly registered pursuant to the Rent Stabilization Code.  The rents so registered shall be deemed the initial legal regulated Rent Stabilization Code rents.  Owner shall follow all procedures and guidelines of HCR and all relevant requirements of the Rent Stabilization Code.

(c)  If the Actual Rent permitted to be charged for a Unit under this Agreement shall be less than the Legal Rent for such Unit, the Actual Rent shall be registered as a "preferential rent" for purposes of the Rent Stabilization Code. This provision shall survive the expiration or termination of the Restriction Period.

C.  <u>No Rent Stabilization Exemptions.</u>  Owner shall not utilize any exemption or exclusion from any requirement of the Rent Stabilization Code to which Owner might otherwise be or become entitled with respect to any Unit, including, but not limited to, any exemption or exclusion from the rent limits, renewal lease requirements, registration requirements, or other provisions of the Rent Stabilization Code due to (i) the vacancy of a Unit where the rent exceeds a prescribed maximum amount, (ii) the fact that tenant income and/or rent exceed prescribed maximum amounts, (iii) the nature of the tenant, or (iv) any other factor.

D.  <u>Additional Requirements for Rental Assistance Units</u>.

(a)  If a Rental Assistance Tenant occupying a Unit loses Rental Assistance at any time, then Owner shall immediately revise the tenant's Actual Rent to an amount that does not exceed the maximum amount permitted under Paragraph 5(A) above.

(b)  Upon vacancy of a Unit that had been occupied by a Rental Assistance Tenant, if the next tenant identified for such Unit does not have Rental Assistance, but the tenant is an Eligible Tenant, then Owner shall set the Actual Rent to an amount that does not exceed the maximum amount permitted under Paragraph 5(A) above.  If this revised Actual Rent is less than the Legal Rent for such Unit, Owner shall register such revised Actual Rent as the new "preferential rent" for such Unit.

E.  Intentionally Omitted.

F.  <u>Rights of Tenants to Enforce.</u>  Any prospective, present or former Eligible Tenant shall have the right to enforce the provisions of Paragraph 5(A) in any New York State court of proper jurisdiction.

6.  <u>Management.</u>

A.  <u>General</u>.

(a)  Owner shall manage and operate the Premises in accordance with generally acceptable management practices in New York City.

(b)  On or before the date hereof, Owner shall enter into a management contract, which contract and management entity shall both be subject to HPD approval. Such contract shall have an initial term of not less than one (1) year.  Any new or replacement management entity or management contract shall be subject to HPD approval. Upon no less than sixty (60) days' notice from HPD to Owner that the Owner and/or its management

entity have failed to comply with this Agreement, Owner shall terminate its management contract and enter into a new management contract with a management entity approved by HPD in its sole and absolute discretion.

(c)     Owner shall be in default of this Paragraph 6(A) if HPD provides written notice to Owner of a violation and Owner has failed to cure such violation within ninety (90) days of such notice.

B.      <u>Maintenance of Premises</u>.   Owner shall maintain and operate the Premises in a proper, safe, sanitary and healthful condition in compliance with all applicable legal requirements, and shall make all necessary repairs and replacements, including curing all housing and building code violations in the time period prescribed by law.

C.      <u>Municipal Charges</u>.   Owner shall pay all municipal charges in a timely manner, including taxes, assessments (and installments of any assessments that are payable in installments), water rates, sewer rents, and other charges, including without limitation, vault charges and fees for the use of vaults, chutes, and similar areas adjoining the Premises, now or hereafter levied or assessed against the Premises prior to the date upon which any fine, penalty, interest or cost may be added thereto or imposed by law for the nonpayment thereof.   Upon HPD request, Owner shall provide HPD with evidence of payment of such charges.

D.      <u>Insurance</u>.

(a)     Owner shall keep the buildings, improvements and all other property on the Premises insured by property insurance policies issued by an insurance company licensed in the State of New York providing coverage on a replacement value basis against fire, vandalism, malicious mischief, collapse, flood (if in a federally designated flood area), earthquakes and other risks customarily insured against under special risks policies in the City of New York.   Owner shall provide HPD on an annual basis with copies of insurance certificates in form satisfactory to HPD evidencing compliance with such requirements.

(b)     Owner shall maintain Commercial General Liability insurance in the amount of at least One Million Dollars ($1,000,000) per occurrence.   In the event such insurance contains an aggregate limit, the aggregate shall apply on a per-location basis applicable to the Premises and such per-location aggregate shall be at least Two Million Dollars ($2,000,000). This insurance shall protect the insured parties from claims for property damage and/or bodily injury or death arising from the operation of the Premises in accordance with this Agreement.   Coverage shall be at least as broad as that provided by the most recently issued Insurance Services Office ("ISO") Form CG 0001, shall contain no exclusions other than as required by law or as approved by the Commissioner, and shall be "occurrence" based rather than "claims-made." To the extent commercially available, policies providing such insurance may not include any endorsements excluding coverage relating to the emission of asbestos, lead, mold, or pollutants.   Such Commercial General Liability insurance shall name the City of New York, together with its officials and

employees, their successors and/or assigns as an Additional Insured with coverage at least as broad as the most recent edition of ISO Form CG 2026.

Notwithstanding the foregoing, this Paragraph 6(D) shall not apply during any period when Owner is in compliance with insurance requirements of any institutional lender, approved by HPD, that is the mortgagee under a trust indenture or mortgage encumbering the Premises as of the date hereof or approved by HPD pursuant to Paragraph 9 below, except that the City of New York, together with its officials and employees, their successors and/or assigns, shall be named as an additional insured on the Commercial General Liability insurance certificate and Owner shall provide evidence of same upon request. Upon request, Owner shall provide HPD with the insurance certificate evidencing the coverage required by such institutional lender.

E.    <u>Housing Repair Agreement</u>:  Owner acknowledges and agrees to perform the capital work (the "<u>Modification Work</u>") described in that certain Housing Repair Agreement entered into by Owner on the date hereof (the "<u>HRA</u>") on the terms and dates set therein.

F.    <u>Service and Maintenance Contracts</u>.  Owner shall only enter into service and maintenance contracts with qualified vendors at commercially reasonable and customary fees.

G.    <u>Renting Vacant Units</u>.   Owner shall use all commercially reasonable efforts to rent vacated units as soon as possible, and shall notify the HPD Assistant Commissioner of the Division of Asset Management or its successor if any units remain vacant for six (6) months.

H.    <u>Building Registration</u>.  Owner shall register the Premises with HPD pursuant to Article 2 of Subchapter 4 of the New York City Housing Maintenance Code.

I.    <u>General Compliance</u>.  Owner shall or shall cause the Project to comply with (i) the rules and regulations of HPD, (ii) any applicable requirements of Rental Assistance, and (iii) any other provisions of federal, state or local law or regulation that may be applicable.

7.    <u>Books, Records and Certifications</u>

A.    <u>Maintenance of Books and Records</u>.  Owner shall keep and maintain full and accurate books and records regarding maintenance, operation and management of the Premises and comply with customary financial and other reporting requirements, and shall permit HPD to review, examine and audit such books and records at all reasonable hours.  Said books and records shall be retained by Owner for six (6) years after the expiration of the Restriction Period.  Upon ten (10) days' written notice from HPD, Owner, including any of its members, officers, directors, employees or agents, shall submit under oath, to an oral examination by authorized representative(s) of HPD concerning any or all matters relating to the Premises and shall produce for examination, review and/or audit by HPD all of such books and records, including, without limitation, journals, ledgers, accounts, check books, canceled vouchers, contracts, correspondence, stock books and minute

8

books, as such notice may specify.  Such notice shall specify the time and place of examination.

B.    <u>Financial Statements</u>.  Upon request, Owner shall submit to HPD annually, in such forms as shall be approved by HPD, (i) a statement of the income and expenses of the Premises, and (ii) proof of insurance.

C.    <u>Budget</u>.  Upon request, Owner shall submit to HPD annually, commencing on the first anniversary of the date hereof and on each anniversary thereafter, a budget for the following year showing anticipated income and expenses for the Premises.

D.    <u>Additional Submissions</u>.  Owner shall submit to HPD in a timely manner such additional reports and information requested by HPD, including, but not limited to, tenant income records for all existing tenants and all tenants who vacated within the previous six (6) years, rent collection reports, vacancy information, management expense reports, receipts evidencing proof of payments, and organizational charts.

8.    <u>Right To Inspect</u>.  HPD and its officers, employees, agents and inspectors shall have the right to enter and inspect the Premises at all reasonable times without prior notice.

9.    <u>Prohibition Against Conveyances, Leasing, and Loans</u>

A.    Except as otherwise provided in this Paragraph 9, Owner shall not, without the prior written approval of HPD,

(i)    further encumber the Premises, including its air rights, with any lien imposed in connection with any other financing, or

(ii)    permit the Premises or any part thereof or any direct or indirect interest therein to be sold, transferred or conveyed to any other person or entity other than a passive investor member, or

(iii)    sell, transfer or convey the Premises or any part thereof or any direct or indirect interest therein, which shall include, but not be limited to,

(1)    when Owner is a business corporation (i) the sale or transfer of more than forty-nine percent (49%) of the outstanding shares of the corporation, or (ii) the dilution of present stockholding or corporate control by issuance of new or treasury stock or by conversion of any non-voting stock or other securities to voting stock, or

(2)    when Owner is a partnership, the withdrawal (except by death), resignation or retirement, of any general partner, or the appointment of any new, or other, or substitute general partner(s) (provided that the foregoing shall not apply to limited partners), or

(3)    when Owner is a limited liability company, the withdrawal (except by death), resignation or retirement, of any member other than a passive investor member, or the appointment of any new, or other, or substitute member or members other than passive investor members.

For the purposes of this Paragraph 9(A), a "passive investor member" is defined as "any member or limited partner of Owner that does not possess directly or indirectly the power to direct or cause the direction of management or policies of the Owner."

B.    Owner shall not, without the prior written consent of HPD:

(a)    lease or license all or substantially all of the Premises to any party or

(b)    lease any commercial unit in the Premises to any affiliate, subsidiary or principal of Owner, or lease any commercial unit in the Premises for less than the prevailing market rent for the neighborhood where the Premises are located.

C.    Following Owner's execution of this Agreement, nothing herein shall prohibit the transfer of the property from an administrator appointed by a court through HPD's 7A Program to Owner in accordance with a court-approve settlement.

D.    Notwithstanding the foregoing, Owner may obtain from a commercial bank or institutional lender (the "Lender") a loan secured or to be secured by a lien on the Premises provided that, (i) Owner shall have given written notice thereof to HPD at least thirty (30) days prior to obtaining such loan stating the name and address of the Lender, the amount and terms of the proposed loan, and security therefor, together with (A) a commitment or term sheet provided by the lender for such loan, (B) financial statements certified by Owner for the previous twelve (12) months showing, among other things, the Net Operating Income for such period, (C) detailed projections of the Net Operating Income and Debt Service assuming such proposed loan is obtained, and (D) a current appraisal of the Premises prepared by an independent real estate appraiser not affiliated with Owner or the proposed lender, and (ii) HPD shall determine, on the basis of the foregoing, and such other documentation as HPD shall request in connection therewith, that (a) the Debt Service Coverage Ratio (as hereinafter defined), will be at least 1.2 to 1, and (b) the Loan-to-Value Ratio (as hereinafter defined) will not be greater than eighty percent (80%).

If the foregoing conditions are satisfied and the loan obtained by Owner is made by the Lender on terms consistent therewith, HPD shall enter into a subordination agreement in its then standard form with such Lender with respect to this Agreement.

10.    Enforcement

A.    In the event of a breach of any of the covenants and agreements contained herein, the City shall have the right to one or more of the following:

(a)    Institute and prosecute any proceeding for an injunction or for specific performance of Owner's obligations hereunder;

(b)    Extend the Restriction Period of this Agreement by the period of such noncompliance upon the recording of an appropriate document, executed solely by the City, against the Premises.  The period of noncompliance

shall be presumed to be the period running from the date of this Agreement to the date that HPD notifies the Owner of such noncompliance, which presumption may be rebutted by Owner.

(c)     Upon written notice from HPD to Owner, prohibit Owner and/or any of its principals from doing new business with HPD for a period of not less than three (3) years from the date of violation.  Such prohibition shall not extend to as-of-right benefits the Owner and/or any of its principals may receive from HPD.

B.     In the event of a threatened breach of any of the covenants and agreements contained herein, the City shall have the right to the remedy described in Paragraph 10(A)(a) above.

C.     HPD, in its sole and absolute discretion, may, in writing, (i) give Owner a period of up to sixty (60) days to cure any violation, provided the violation can be cured without affecting the rights of any bona fide tenants who have executed leases with Owner, or (ii) waive any of the provisions of this Paragraph 10.  No such waiver shall be effective unless it is in writing.  Further, no delay or waiver in enforcing the provisions hereof as to any violation shall impair, damage or waive the right of the City to enforce this Agreement in the event of a continuation or repetition of such breach or violation or any similar breach or violation hereof at any later time.

Any breach of any of the covenants and agreements contained herein will be considered an event of default hereunder.

11.     Covenants Run With The Land. This Agreement shall run with the land and shall bind all subsequent parties in interest to the Premises during the Restriction Period.

12.     Amendments.   Except as otherwise set forth herein, this Agreement may only be amended by a written instrument executed by all parties hereto in recordable form.

13.     Investigations.  Owner shall be bound by the provisions of **Exhibit B** attached hereto and made a part hereof.

14.     Binding Nature of Restrictions.   Owner at its sole cost and expense shall cause this Agreement to be recorded against the Premises in the City Register.  The restrictions set forth in this Agreement shall run with the land and bind Owner, Owner's successors, assigns, heirs, grantees, and lessees.  All references to "Owner" in this Agreement shall include Owner's successors, assigns, heirs, grantees, and lessees.

15.     Notices.  All notices, approvals, requests, waivers, consents or other communications given or required to be given under this Agreement shall be in writing and sent or transmitted as follows:

If to Owner:          1516 Bedford Avenue, LLC
                      70 Lyman Place
                      Staten Island, New York 10304
                      Attn:  Gavriel Sakaff

Mobile No.:  646-387-7770

with a copy to:        Soriano, Henkel, Biehl & Matthews, PC
75 Eisenhower Parkway, Suite 110
Roseland, New Jersey 07068
Attn:  Frederick C. Biehl, III, Esq.
Facsimile:  973-364-1073

If to HPD:        Department of Housing Preservation and Development
100 Gold Street
New York, New York 10038
Attn:  Assistant Commissioner for Preservation Finance
Facsimile: (212) 863-6488

with a copy to:        Department of Housing Preservation and Development
100 Gold Street
New York, New York 10038
Attn:    General Counsel
Facsimile: (212) 863-8377

Notices shall be given by hand delivery, transmittal via facsimile or by certified or registered mail, return receipt requested.  Notice shall be deemed to have been given upon delivery and confirmed receipt.

16.        HPD Discretion.  All determinations to be made by HPD or the City in accordance with this Agreement shall be in the sole discretion of HPD.

17.        Expiration.  Except as otherwise provided herein, upon the expiration of the Restriction Period, this Agreement shall be of no further force and effect; provided, however, that HPD shall retain all of its rights and remedies to enforce this Agreement with respect to any default or violation that occurred prior to the expiration of the Restriction Period.  HPD shall, if requested by Owner, execute and deliver to Owner a document in recordable form to reflect the expiration of this Agreement.

18.        Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original.

19.        Project Subject To Several Restrictions. If this Agreement conflicts with any other applicable agreement, law, regulation or permit, or if any provision of this Agreement conflicts with any other provision of this Agreement, the most restrictive provision (as determined by HPD) shall control.

20.        Primary Residence.  Units may only be occupied as a primary residence, as defined in Rent Stabilization, by natural persons or families pursuant to a one or two year lease who have met the applicable income requirements for Eligible Tenants at the time of such tenant's initial occupancy of such Unit.  Owner shall only offer a vacant Unit for occupancy by persons or families intending to occupy such Unit as their primary residence pursuant to a one or two year lease and shall not cause or permit the sublease or assignment of any Unit for transient occupancy, for occupancy by any household that is not income eligible, or to any corporation or other entity.

21.   <u>Contractual Rent Regulation</u>.

A.    <u>Definitions</u>.

"<u>Destabilization</u>" shall mean any set of facts that causes Rent Stabilization to no longer apply to the Units subject to this Agreement, whether by expiration, legislative repeal, judicial invalidation, or any other reason.

"<u>Contractual Rent Regulation</u>" shall mean the following after Destabilization:

(a)   Owner shall be required to offer renewal leases on the same terms and conditions as had been required by Rent Stabilization at the time of Destabilization (subject however to the provisions in subparagraphs (b) and (c) below), as if the Unit was still subject to and not excluded or exempted from any provision of Rent Stabilization, including, but not limited to, any exemption or exclusion regarding rent limits, renewal lease requirements, or any other provision due to (i) the vacancy of a Unit where the rent exceeds a prescribed maximum amount, (ii) the fact that tenant income and/or Unit rent exceed prescribed maximum amounts, (iii) the nature of the tenant, or (iv) any other factor.

(b)   The "<u>Legal Rent</u>," as such term is used in this Agreement, shall be limited by percentage increases calculated based on a method or index established by HPD for determining the maximum increase to Legal Rent upon lease renewal or vacancy.  Such method or index shall be based on inflation or on factors substantially equivalent to the factors considered in calculating such increases under Rent Stabilization at the time of Destabilization, and shall incorporate a method for determining and implementing increases to Legal Rent by reason of major capital improvements performed by Owner, to the extent that such increases, if any, are not prohibited hereunder.  HPD will publish such methodology in the City Record and will provide a copy of the methodology to Owner upon request.

(c)   Wherever this Agreement limits increases in rent by increases as permitted by Rent Stabilization (or language of similar import), such increases shall be limited by the percentage increases established by HPD as described in subparagraph (b) above.

B.    If Destabilization occurs during the Restriction Period, then for the remainder of the Restriction Period, all Units that have undergone Destabilization shall be subject to Contractual Rent Regulation.  If some Units remain subject to Rent Stabilization while other Units have undergone Destabilization, Contractual Rent Regulation will only apply to the Units that have undergone Destabilization.

22.   <u>Prohibition on Condominium or Cooperative Ownership</u>.  During the Restriction Period the Owner shall not convert, reorganize, or change the form of ownership of the Premises to condominium ownership or to any form of cooperative ownership without first obtaining HPD's written consent thereto, which consent may be withheld by HPD in its sole discretion.  Any conversion following the expiration of the Restriction Period must conform to State and City of New York laws and must be on the basis of a non-eviction

plan. The restrictions and requirements of this paragraph shall survive the expiration or termination of the Restriction Period.

23.  <u>Authority.</u>

A.  If the Owner is a corporation, the Owner hereby represents and warrants that its board of directors has by proper action, which has not been revoked or modified, duly authorized the execution of this Agreement by the undersigned officer(s) and, if required by Owner's certificate of incorporation, its shareholders or members have voted or consented in full compliance with the requirements thereof to authorize the execution of this Agreement.

B.  If the Owner is a partnership, the Owner hereby represents and warrants that its partners have duly consented in full compliance with the requirements of its partnership agreement and/or applicable law to the execution of this Agreement and authorized the execution of this Agreement by the undersigned partner(s), and that such consent and authorization have not been revoked or modified.

C.  If the Owner is a limited liability company, the Owner hereby represents and warrants that its managers and/or members have duly consented in full compliance with the requirements of its operating agreement and/or applicable law to the execution of this Agreement and authorized the execution of this Agreement by the undersigned manager(s) or member(s), as the case may be, and that such consent and authorization have not been revoked or modified.

24.  <u>Devotion of Premises to Residential Use</u>.  The Premises shall be devoted solely to residential use.

25.  <u>Entire Agreement.</u>  This Agreement contains the entire agreement and understanding of the parties hereto and alone fully and completely expresses their agreement.  Any and all prior discussions, statements, representations and understandings, whether oral or written, relating in any respect to the subject matter of this Agreement are merged herein.

26.  <u>HPD Marketing Guidelines</u>. Owner shall market the Units in accordance and consistent with the Marketing Handbook.

27.  <u>HPD's eRent Roll System</u>.  Owner shall submit required rent rolls to HPD in such form and in such manner as directed by HPD, including, but not limited to, submission by electronic means using software designated by HPD.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

**THE CITY OF NEW YORK**
By its Department of Housing Preservation and Development

By: _____
      Name:  Kerry LaBotz
      Title:    Assistant Commissioner

**1516 BEDFORD AVENUE, LLC**

By: _____
      Name:
      Title:

APPROVED AS TO FORM
BY STANDARD TYPE OF CLASS
UNTIL _____

By: _____
    (Acting) Corporation Counsel

## <u>UNIFORM ACKNOWLEDGEMENTS</u>

STATE OF NEW YORK     )
                              ) ss.:
COUNTY OF NEW YORK   )

On the _____ day of _____ in the year 2020 before me, the undersigned, a Notary Public in and for said State, personally appeared **KERRY LABOTZ**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                           _____
                                             Notary Public

STATE OF NEW YORK     )
                              ) ss.:
COUNTY OF NEW YORK   )

On the _____ day of _____ in the year 2020 before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                           _____
                                             Notary Public

**EXHIBIT A**
<u>**PROPERTY DESCRIPTION**</u>

All those certain plots, pieces and parcels of land, with the buildings and improvements thereon erected, situate, lying and being in the City and State of New York, designated on the Tax Map of the City of New York:

Borough:      Brooklyn

County:       Kings

Block:        1252

Lot:          80

Address:      1516 Bedford Avenue

**EXHIBIT B**
**INVESTIGATION CLAUSE**

(a)    The parties to this Agreement agree to cooperate fully and faithfully with any investigation, audit or inquiry conducted by a State of New York (State) or City of New York (City) governmental agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party in interest to the transaction, submitted bid, submitted proposal, contracts, lease, permit, or license that is the subject of the investigation, audit or inquiry.

(b)    If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract, or license entered into with the City, the State or any political subdivision or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the laws of the State of New York, or;

(c)    If any person refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City, then;

(d)    The commissioner or agency head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license shall convene a hearing upon not less than five (5) days written notice to the parties involved to determine if any penalties should attach for the failure of a person to testify.

(e)    If any non-governmental party to the hearing requests an adjournment, the commissioner or agency head who convened the hearing may, upon granting the adjournment, suspend any contract, lease, permit, or license pending the final determination pursuant to paragraph (g) below without the City incurring any penalty or damages for delay or otherwise.

(f)    The penalties which may attach after a final determination by the commissioner or agency head may include but shall not exceed:

(1) The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from the City; and /or

(2) The cancellation or termination of any and all such existing City contracts, leases, permit, or licenses that the refusal to testify concerns and that have not been assigned as permitted under this agreement, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the City incurring any penalty or damages on account of such cancellation or termination; moneys lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

(g) The commissioner or agency head shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in paragraphs (1) and (2) below.   He or she may also consider, if relevant and appropriate, the criteria established in paragraphs (3) and (4) below in addition to any other information which may be relevant and appropriate:

(1) The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including but not limited to the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees or fiduciaries whose testimony is sought.

(2) The relationship of the person who refuses to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

(3) The nexus of the testimony sought to the subject entity and its contracts, leases, permits or licenses with the City.

(4) The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties under (f) above, provided that the party or entity has given actual notice to the commissioner or agency head upon the acquisition of the interest, or at the hearing called for in (d) above gives notice and proves that such interest was previously acquired.   Under either circumstance the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

(h)
(1) The term "license" or "permit" as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right.

(2)     The term "person" as used herein shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee.

(3)     The term "entity" as used herein shall be defined as any firm, partnership, corporation, association, or person that receives moneys, benefits, licenses, leases, or permits from or through the city or otherwise transacts business with the City.

(4)     The term "member" as used herein shall be defined as any person in association with another person or entity as a partner, officer, principal or employee.

(i)     In addition to and notwithstanding any other provisions of this Agreement the Commissioner or agency head may in his or her sole discretion terminate this Agreement upon not less than three (3) days written notice in the  in the event the contractor fails to promptly report in writing to the Commissioner of Investigation of the City of New York any solicitation of money, goods, requests for future employment or other benefit or thing of value, by or on behalf of any employee of the City or other person, firm, corporation or entity for any purpose which may be related to the procurement or obtaining of this Agreement by the Contractor, or affecting the performance of this Agreement.

**EXHIBIT C**

**Rents Affordable to Households Making 100% AMI– 2020 AMI's**

|  |  | Applicable AMI (30% of 100% of AMI) | Initial Rents* | Applicable AMI Rents as of 2020* | Maximum Household Income Restriction |
|---|---|---|---|---|---|
| studio | 0 | 100% of AMI | $1,904 | $1,904 | 120% of AMI |
| 1 BR | 8 | 100% of AMI | $2,035 | $2,035 | 120% of AMI |
| 2 BR | 8 | 100% of AMI | $2,439 | $2,439 | 120% of AMI |
| 3 BR | 0 | 100% of AMI | $2,810 | $2,810 | 120% of AMI |

*Assumes tenants pay gas and electricity utilities

---

## REGULATORY AGREEMENT

---

**BETWEEN**

**THE CITY OF NEW YORK**

**and**

**1516 BEDFORD AVENUE, LLC**

---

| | |
|---|---|
| Borough: | Brooklyn |
| County: | Kings |
| Block: | 1252 |
| Lot: | 80 |
| Address: | 1516 Bedford Avenue |

---

RECORD AND RETURN TO:

Department of Housing Preservation
   and Development
100 Gold Street
New York, NY  10038

---

# **EXHIBIT C**

## HOUSING REPAIR AGREEMENT

**THIS AGREEMENT** ("Agreement"), entered into as of February ___, 2020 among **1516 BEDFORD LLC**, a limited liability company, having its principal office at _____, _____, New York _____ (the "Owner") and **THE CITY OF NEW YORK** (the "City"), a New York municipal corporation acting by and through its Department of Housing Preservation and Development, having its principal office at 100 Gold Street, New York, New York 10038 ("HPD").

**WHEREAS,** Owner shall acquire the record fee estate or interest in and to the premises, including the land and improvements thereon, described in Exhibit A annexed hereto and made a part hereof (the "Premises"); and

**WHEREAS**, to induce HPD to consent to the sale of the Premises to the Owner, HPD requires Owner, among other conditions, to agree that the Premises be restricted in the manner hereinafter provided.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency whereof is hereby acknowledged, the Owner agrees as follows:

1. Unless otherwise extended by HPD in its sole and absolute discretion, Owner, at its sole cost and expense, shall complete the work described on <u>Schedule B</u> attached hereto (the "Work") no later than **[ _____ ]**, which date may be extended by HPD in its sole and absolute discretion.  The work is estimated to cost $1,326,000.

2. Upon completion of the Work, Owner shall certify same in writing to HPD's Director of Leveraged Preservation Programs together with third party verification in support thereof (the "Certification").

3. Upon delivery of the Owner's Certification and HPD's review and approval thereof, Owner shall be deemed to have complied with the terms and conditions of this Agreement and this Agreement shall terminate.

4. The Work shall be done in a good and workmanlike manner using high quality materials and shall comply in all material respects with all requirements of all governmental authorities having jurisdiction.

5. Owner shall take affirmative action to assure the proper utilization of minority as well as non-minority workers, contractors, and subcontractors in connection with the Required Work. Owner will not discriminate in hiring workers or employ any contractor or subcontractors who shall discriminate in hiring workers because of age, sex, race, color, creed or national origin, in connection with the Work.

6. In any action or proceeding commenced by HPD against the Owner arising out of or in connection with the Owner's breach or violation of this Agreement, the Owner hereby consents that service of process upon the Owner may be made by regular mail and that such service shall constitute personal service upon the Owner.

7. This Agreement shall bind the Owner and HPD and their respective heirs, personal representatives, successors and assigns.  This Agreement shall not be modified,

changed, discharged, waived or terminated orally but only by an agreement in writing duly executed by HPD and Owner.

8.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same document, and any of the parties or signatories hereto may execute this Agreement by signing any of such counterparts.

9.  If this Agreement contains any unlawful provision not an essential part of this Agreement and which shall not appear to have been a controlling or material inducement to the making thereof, the same shall be deemed of no effect and shall, upon notice by either party, be deemed stricken from this Agreement without affecting the binding force of the remainder.

10. Notwithstanding any provision of this Agreement to the contrary, in the event of any delay or delays in the performance of the Work, if such delay or delays are beyond the control and without the fault or negligence of Owner, and are caused by reason of (i) any acts, laws, rules, regulations, or orders of any governmental authority, (ii) acts of God or of the public enemy, or (iii) fires, floods, epidemics, quarantine restrictions, strikes or other labor disputes, freight embargoes, material shortage, or weather of unusual severity, then the Deadline shall be extended for such period as HPD shall find in writing to be the period of such delay or delays, but in no event more than one (1) year without the prior written consent of HPD (collectively, "Force Majeure Delays").  Such extension or extensions shall not be unreasonably withheld or delayed, provided that, promptly after the beginning of such Force Majeure Delay(s), Owner notifies HPD in writing of the Force Majeure Delay(s) and the cause or causes thereof.   Owner shall proceed in accordance with this Agreement with those obligations the performance of which is not prevented by such Force Majeure Delay(s) unless HPD, in writing, shall excuse from proceeding with all or part of such obligations.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the Owner has caused this Agreement to be signed by their duly authorized officers as of the day and year written above.


**1516 BEDFORD LLC**


By:    _____
       Name:
       Title:

**<u>SCHEDULE A</u>**

All those certain plots, pieces and parcels of land, with the buildings and improvements thereon erected, situate, lying and being in the City and State of New York, designated on the Tax Map of the City of New York:

Borough:        Brooklyn

County:         Kings

Block:          1252

Lot:            80

Address:        1516 Bedford Avenue

## SCHEDULE B – WORK

### REPAIR WORK

1516 Bedford Avenue, Brooklyn N.Y. 11216
Cost of Building Rehabilitation

| Apartment | Subject | Description | Estimated cost per unit | Total Cost |
|---|---|---|---|---|
| 1A (1 BDR) | Demolition | Strip all sheetrock, flooring kitchens baths, ceilings, some beams, water pipes, elect. outlets and wiring. | $80,000.00 | $80,000.00 |
| | Beams | A few beams to be replaced | | |
| | Insulation | New insulation in all walls | | |
| | Electrical | New wiring and elect. boxes in all walls and ceilings | | |
| | Water | New water piping for the whole apt. | | |
| | Drywall | New drywall throughout the apt | | |
| | Taping/painting | New taping/painting throughout the apt | | |
| | Bathrooms | New bathtubs, toilets, sinks, wall tile, medicine cabinet, vent, doors. | | |
| | Kitchens | New cabinets, countertops, sinks, wall tile, all appliances, vent. | | |
| | Flooring | Wood floor and ceramic tile throughout | | |
| | Ceilings | New ceilings throughout | | |
| | Lighting fixtures | New lightning fixtures throughout | | |
| | Fire alarms | New fire alarms throughout | | |
| | Smoke detectors | New smoke detectors throughout | | |
| 6 Units 1B, 2B, 3B, 3C, 4B, 4C (2 BDR) | Demolition | Strip all sheetrock, flooring kitchens baths, ceilings, some beams, water pipes, elect. outlets and wiring. | $90,000.00 | $540,000.00 |
| | Beams | A few beams to be replaced | | |
| | Insulation | New insulation in all walls | | |
| | Electrical | New wiring and elect. boxes in all walls and ceilings | | |
| | Water | New water piping for the whole apt. | | |
| | Drywall | New drywall throughout the apt | | |
| | Taping/painting | New taping/painting throughout the apt | | |
| | Bathrooms | New bathtubs, toilets, sinks, wall tile, medicine cabinet, vent, doors. | | |
| | Kitchens | New cabinets, countertops, sinks, wall tile, all appliances, vent. | | |
| | Flooring | Wood floor and ceramic tile throughout | | |
| | Ceilings | New ceilings throughout | | |
| | Lighting fixtures | New lightning fixtures throughout | | |
| | Fire alarms | New fire alarms throughout | | |
| | Smoke detectors | New smoke detectors throughout | | |
| 9 Units 1C, 2A, 2D, 3A, 3D, 4A, 4D (1 BDR) 1D, 2C, (2 BDR) | Taping/painting | New taping/painting throughout the apt | $20,000.00 | $180,000.00 |
| | Bathrooms | New wall tiles, medicin cabinet | | |
| | Kitchens | New cabinets, countertops, sinks, wall tile, all appliances, vent. | | |
| | Flooring | Repair some of the wood and ceramic flooring | | |
| Building Common Areas Infrastructure | Structure & main staircase | | $120,000.00 | $526,000.00 |
| | Heating | Replacing boilers, and heating system | $100,000.00 | |
| | Windows & doors | Replace windows and doors throughtout where necessary | $50,000.00 | |
| | Remove asbestos | | $26,000.00 | |
| | Water heating | Place a hot water heater inside every apartment | $160,000.00 | |
| | Engineer | | | |
| | Architect | | $70,000.00 | |
| | Gover. fees | | | |
| | Expediting | | | |
| | Permits | | | |

| | | |
|---|---|---|
| | TOTAL | $1,326,000.00 |

# EXHIBIT D

**[PROPERTY OWNER]**
**[ADDRESS]**
**[CITY, STATE, ZIP]**
**PHONE: [XXX-XXX-XXXX] FAX: [XXX-XXX-XXXX]**

TEMPORARY APARTMENT RELOCATION AGREEMENT

AGREEMENT MADE by and between 1516 Bedford Avenue LLC, a New York State, limited liability company with offices at **C/O Frederick C. Biehl III, Soriano Henkel Biehl and Matthews, P.C 75 Eisenhower Parkway, Roseland, New Jersey 07068**, hereinafter referred to as "Owner," Owner and the undersigned tenant, a legal resident of **[address, city, state, zip]** (the "Property"), hereinafter referred to as "Tenant."

WHEREAS, Tenant resides in Apartment _____ at **[address]** ("Current Apartment") and the Owner is working towards the redevelopment/rehabilitation of the Property;

WHEREAS, Owner, as a part of the redevelopment process, has identified certain work that is necessary for the improvement of the building and safety of its residents ("Abatement Work"), which can only be performed safely once Tenant has been relocated;

WHEREAS, Tenant has agreed to relocate to facilitate and expedite the Abatement Work, NOW,
THEREFORE, the parties agree as follow:

Tenant has agreed to temporarily re-locate to a suitable temporary apartment ("Temporary Apartment"), and pay a monthly rent based upon and calculated pursuant to the terms of his/her current valid lease at **[address]**, along with all arrears currently due at the Current Apartment pursuant to agreements, stipulation and/or court orders regarding such with Owner either directly or through Owner's property manager and/or attorneys. Tenant will be provided with the Temporary Apartment for the safety and comfort of Tenant while renovations take place. Temporary Apartment will be suitable to Tenant's current household size, not to be any larger or smaller than their current apartment. Tenant understands given the limited availability of rental apartments in New York City that Tenant may have to relocate to two separate apartments. Additionally Tenant understands that if their legal residence at **[address]** has an excessive number of bedrooms relative to their household size, Tenant will have to move to a smaller Temporary Apartment with a bedroom count suitable to their household size. Owner will work with Tenant to locate Temporary Apartment of suitable geographic location within the area, or outside the area if tenant approves.

Owner shall send written notice to Tenant at least forty-five (45) days prior to the date upon which Tenant must relocate to the Temporary Apartment (the "Relocation Date"), which Relocation Date shall be no less than thirty (30) days following Tenant's receipt of such notice unless otherwise agreed to in writing by Tenant. Tenant agrees that he/she is responsible for packing all personal possessions for the move into Temporary Apartment. Owner will be responsible for the overall moving of furniture, packed, boxed and otherwise packaged personal belongings, including the cost of moving, and for any cost related to the transferring of utility accounts. Tenant is personally responsible for moving any valuable items to Temporary Apartment.

Tenant will be allowed to move back into it Current Apartment under his/her current valid lease at **[address]** once the abatement work is completed. Tenant agrees that he/she will relocate back to its Current Apartment at **[address]** within 30 days of receiving notice that the apartment is ready for re-occupancy. In preparation for moving back to its Current Apartment at **[address]** Tenant agrees that he/she will again be responsible for packing all his/her personal possessions. Owner will be responsible for moving Tenant's belongings back into **[address]**, including the cost of moving, and for any cost related to the transferring of utility accounts. Tenant is personally responsible for moving any valuable items to **[address]**.

Tenant understands and agrees that all terms and conditions under their current lease will apply to the Temporary Apartment. Therefore Tenant acknowledges that failure to comply with their current lease in Temporary Apartment, including non-payment of rent, will result in housing court proceeding against Tenant to evict Tenant from Temporary Apartment and **[address]**.

Tenant further understands that relocation back to **[address]** is based upon him/her delivering Temporary Apartment back in the condition that it was when he/she moved in, except for ordinary wear and tear. Tenant agrees to pay for any assessed damages done to Temporary Apartment by Tenant prior to relocation back to **[address]**.

Tenant will be given 30 days' notice prior to returning to its Current Apartment at **[address]**. If Tenant fails to be prepared to move back into its Current Apartment at **[address]** within this 30 days period of notice that **[address]** is ready for re-occupancy housing court proceedings will be commence to evict Tenant from the Temporary Apartment, unless Owner and Tenant otherwise agreed in writing to an alternate arrangement.

Default under the terms and conditions of Tenant's current lease that are not inconsistent with this agreement, will result in eviction proceedings from the Current Apartment. **Default under this agreement will result in eviction proceedings from** Temporary Apartment.

This Agreement constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter, all of which are merged herein. This Agreement may not be modified, amended or terminated nor may any of its provisions be waived, except by an agreement in writing signed by the party against whom enforcement of any modification, amendment, termination or waiver is sought.

Tenant shall not assign the rights granted under this Agreement in whole or in part to any other person.

The covenants, agreements, terms, provisions and conditions contained in this Agreement shall be binding upon and inure the benefit of the parties hereto and their respective successors and assigns (except as otherwise prohibited by this Agreement).

This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York.

If any term, covenant or provision of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such term, covenant or provision.

Tenant acknowledges that Tenant has the absolute right to have an attorney review this Agreement and either has had an attorney do so or has freely foregone such right.

The undersigned acknowledge that they understand the meaning and impact of each and every term of this Agreement, and have entered into this Agreement freely and without reservation, undue influence or duress of any kind and nature, and with the knowledge that this Agreement will be binding upon them.

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but such counterparts shall together constitute but one and the same instrument.

_____
Name of Head of Household          Apt

_____
Date

_____
[Owner]

_____
Date